**Paul TALANDA, Plaintiff–Appellant,**

**v.**

**KFC NATIONAL MANAGEMENT COMPANY, a Delaware Corporation, doing business as KFC, also known as Kentucky Fried Chicken, a Delaware Corporation and a subsidiary of Pepsico, Inc., a North Carolina Corporation, Defendant–Appellee.**

**No. 97–2025.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 1997.

Decided April 7, 1998.

---

H. Candace Gorman (argued), Chicago, IL, for Plaintiff–Appellant.

Louis Theros, Dickinson, Wright, Moon, Van Dusen & Freeman, Chicago, IL, Noel D. Massie, Eric J. Pelton (argued), Kienbaum, Opperwall, Hardy & Pelton, Birmingham, MI, for Defendant–Appellee.

Before WOOD, Jr., RIPPLE and DIANE P. WOOD, Circuit Judges.

RIPPLE, Circuit Judge.

After KFC National Management Company ("KFC") terminated Paul Talanda's employment, Mr. Talanda responded by filing this lawsuit. The central allegation, and the only one appealed, was that his retaliatory discharge violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213. Mr. Talanda's employment was terminated a few weeks after he had hired Dorothy Bellson to serve customers at the front counter of his KFC restaurant. Mr. Talanda hired Bellson knowing that a number of her teeth were missing. His supervisor told him to move Bellson from the front counter position; Mr. Talanda refused and was fired. He claims his termination was in retaliation for his refusal to follow his supervisor's order to move Bellson from the front counter, out of view of the customers, because of her facial disfigurement. His em-

ployer, KFC, claims that his termination resulted from his acts of insubordination. The district court granted summary judgment to KFC. For the reasons set forth below, we affirm the judgment of the district court.

## I

### BACKGROUND

#### A. *Facts*

Paul Talanda began working for KFC in 1978 as a food service worker. By 1993, he had worked his way up through the ranks to Training Store Manager of the KFC store in McHenry, Illinois.[1] In September of that year, Dorothy Bellson applied for a job in Mr. Talanda's KFC. On her application, she stated that she preferred to work in "cook & prep." However, the only opening in the store at the time was the job of "customer service worker," one who works in the front of the store serving customers and operating the cash register. Even though Mr. Talanda noted that Bellson was missing many teeth, he hired her because her prior experience qualified her for the position and because he believed her friendly, outgoing personality was an asset when greeting customers.

However, Mr. Talanda's supervisor, Market Manager Joanne Overly, was concerned when she saw a person with "serious dental problems" at the front counter. R.71, Ex.G at 1. According to Mr. Talanda, Overly phoned him and stated that she could not believe he had hired someone with missing teeth to work the front counter. Overly's description of the phone conversation suggested a different tone. According to Overly, she offered a business reason,[2] namely Bellson's unprofessional appearance, for wanting Bellson moved from the front counter: "Well, we [KFC] required a lot of smiles

---

1. A Training Store Manager is responsible for managing a KFC restaurant, training assistant managers and teaching orientation classes to new employees. In that position, Mr. Talanda became a President's Club member. Mr. Talanda's performance reviews throughout his years of employment at KFC were consistently favorable; just six weeks before his termination, Mr. Talanda was told that he was a "very solid performer" who met or exceeded expectations. R.71, Ex.D at 4.

2. Overly wrote a memo documenting her conversations with Mr. Talanda. In it she stated that Bellson's position in front of customers was "not a wise business decision." R.71, Ex.G at 1. At an administrative hearing held December 14, 1993, before the Illinois Department of Employment Security, Overly explained that her request to have Bellson moved was based on the KFC grooming policy and on its smile requirement. She felt that Bellson's smile "was not a professional image that we wanted to portray" and "was not an appetizing situation." R.71, Ex.I at 17–18.

and friendliness. And Miss Bellson was missing quite a few teeth." R.71, Ex.E at 28. When Overly told him to move Bellson to a food service position in the back of the restaurant, Mr. Talanda responded that people whose teeth are discolored from smoking would have the same difficulty. He then told Overly that he would "work around it," and meant that he would work around her directive. R.51, Ex.A at 216. Overly believed that Mr. Talanda had agreed to find a different position for Bellson. R.71, Ex.G at 1. However, Mr. Talanda did not change Bellson's duties and did not move her out of the sight of customers.

A day or two later, Mr. Talanda phoned Overly and secretly tape recorded their conversation. He explained that he had worked with Bellson the entire day at the front counter of his store, that she had done a good job, and that he wanted to keep Bellson on the front counter. Overly reiterated her position that Bellson should not work in the front waiting on customers but that she could be a cook or prep person. Overly firmly stated that the issue was not up for discussion and that she would not change her mind. When Overly confirmed that Mr. Talanda could "get in trouble" if he kept Bellson working up front, he agreed to do as she wished.[3] Overly also questioned Mr. Talanda's judgment, stating that she was concerned that he would even consider "having someone like that on your service line . . . because it gives a very bad impression of your restaurant." R.71, Ex.H at 4. When Mr. Talanda pointed out that Bellson was friendly to the customers, Overly responded that it was "really a turn-off to me as a customer to see that mouth. I mean, if she got her teeth fixed, that wouldn't be an issue." *Id.* at 5. Mr. Talanda replied that he understood her position and would work around it.

The next day, Mr. Talanda met Bellson at another location and played for her the recording of the secretly taped phone conversation. When Bellson became upset by it, Mr. Talanda told her that Overly's directive was morally wrong and that he would stand up for Bellson. He also informed her that "corporations could be fined money for taking actions like this against their employees." R.50, Ex.A at 247. Bellson agreed to keep working as a customer service worker.

For almost three more weeks, Mr. Talanda ignored Overly's instruction; Bellson continued to work at the front counter. He gave two reasons for disobeying Overly's directive: (1) He thought that the order was morally and legally wrong; and (2) he believed he was being asked to discriminate against Bellson on account of her facial disfigurement. According to KFC, however, Mr. Talanda never suggested to anyone at KFC (except Bellson herself) that he believed Overly's directive was discriminatory and illegal. Over those few weeks, Overly received reports about Mr. Talanda from other employees. The shift supervisor in Mr. Talanda's McHenry restaurant, Nancy DeMarco, told Overly that Bellson was upset and wanted to speak with Overly. Overly learned from Bellson that Mr. Talanda had made the secret tape, that he wanted Bellson to bring a discrimination suit against KFC and its parent company Pepsico, and that he had been pressuring her about filing the lawsuit so that they could make money. Bellson also stated in her affidavit that she told Overly that she "felt harassed by Mr. Talanda getting [her] involved in his set-up of the Company for discrimination." R.50, Ex.D at para. 19. Overly learned from Ken Gand, another restaurant manager in her territory, that Mr. Talanda "had something" on Overly and wanted to "get her."[4] R.50 at para. 19.

---

**3.** This part of the conversation was transcribed as follows:

> FEMALE VOICE: I'm not going to change my mind.
> MALE VOICE: All right. So, well, you know, if she's working up front then I can get in trouble then right?
> FEMALE VOICE: What do you mean you can get in trouble?
> MALE VOICE: Well, I mean, if you come in and you see her working up front, you know, if I, you know, and then I do this then I can get in trouble; right?

> FEMALE VOICE: Yeah, you can, if that's the way you want to put it.
> MALE VOICE: Okay. Well, I don't want to go against your wishes, . . . and if that's how you really feel about it then I won't.

R.71, Ex.H at 4-5.

**4.** Mr. Talanda denies that he spoke with Ken Gand about his taped conversation with Overly. He also denies that he told Bellson that he would pursue discrimination charges against Overly.

The information Overly received over those weeks led her to believe that Mr. Talanda's goals or motives were to urge Bellson to sue KFC and to cause Overly's termination.

Overly took this information to John Malloy, KFC's Director of Human Resources for the area. They decided that Mr. Talanda's actions were sufficiently serious to warrant termination. However, they called a meeting with him to give him a chance to offer reasons for his actions. When the three met on October 19, 1993, Mr. Talanda admitted that he had refused to obey Overly's directive but gave no explanation for it. Even though Malloy asked him directly for an explanation, Mr. Talanda did not state that he believed Overly's order was illegal or improper.

Mr. Talanda was discharged that day, October 19, 1993. The letter of termination, which Mr. Talanda received from Overly a few days later, described in detail Mr. Talanda's refusal to move Bellson,[5] in defiance of Overly's direction, and other acts of insubordination.[6] The letter concluded that Mr. Ta-

landa was terminated because he chose not to explain his position or to comment on any of the issues in the meeting with Malloy and Overly.

After receiving a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC"), Mr. Talanda filed suit in district court, alleging retaliatory discharge under both the ADA and Illinois law and raising state law claims of breach of contract, promissory estoppel, defamation, false light, tortious interference with a business expectancy and intentional infliction of emotional distress.

## B. Decision of the District Court

The parties' cross-motions for summary judgment were referred first to a magistrate judge. The Report and Recommendation recommended denial of both parties' motions for summary judgment with respect to the ADA count.[7] The district court accepted only the recommendation to deny plaintiff's motion for summary judgment. It then

---

**5.** Overly's Memorandum of October 26, 1993, stated:

Paul, on September 28, 1993, we had a telephone conversation in which I had asked you to remove Dorothy (Dee) Bellson from the front counter. I suggested you place her in another position, either as a prep person or cook.... We concluded this conversation with your agreement to remove Dee from the front line, repositioning her....

I received a page from you on September 30th. When I returned your call, you stated that you had worked with Dee on the front line for most of the day. I replied to you that my decision was final about Dee working up front. I told you that I expected you to comply with my direction by finding another position for her to work. You agreed for the second time to do so.

Paul, you directly violated my authority by not removing Dee from the front counter. You in fact, specifically told Dee that she would stay up front regardless of what I said. You told her that if I ever came into the store, she was to go in the back of the restaurant and pretend to be working there. You also disregarded Dee's wishes to be placed elsewhere. She told you that she herself felt uncomfortable waiting on customers due to her severe dental problems.

This behavior is totally unacceptable....
R.51, Ex.J.

**6.** The other "acts of insubordination and/or company policy violations" enumerated in the termination letter are these:

1. ignoring Bellson's wishes to be placed elsewhere in the store;
2. tape recording his phone conversation with Overly;
3. refusing to post a MERIT work schedule for employees;
4. not selling the BBQ chicken sandwich as requested;
5. not giving Bellson a new employee test or orientation test;
6. lying to Overly about training Bellson on the register.

R.50, Ex.J. Mr. Talanda addressed and rebutted many of these allegations of insubordination. We focus, as do the parties, on the key issue, Mr. Talanda's refusal to follow Overly's order.

**7.** The Report and Recommendation concluded that Mr. Talanda had offered sufficient evidence to create a factual dispute concerning (1) whether he had engaged in a protected activity under the ADA and (2) whether KFC had knowledge of Mr. Talanda's motive for refusing to follow Overly's directive. It also found that KFC had proffered a number of legitimate, nondiscriminatory grounds for the termination and that Mr. Talanda had created a genuine issue of material fact as to whether those reasons were merely pretextual. With respect to the remaining counts, the magistrate judge's Report and Recommendation concluded that summary judgment should be granted to KFC.

granted summary judgment to KFC on the ADA count and dismissed the remaining common law and state statutory counts without prejudice. According to the district court, the ADA's protection of an employee from an employer's retaliation is available only when the employee has a reasonable belief that he is opposing discrimination. The court found that Mr. Talanda could not reasonably have believed that he was opposing a discriminatory order for two reasons: (1) Bellson was neither a person with a disability nor a person regarded as being disabled; and (2) Overly's order to move Bellson from the front counter to a different job was not an adverse employment action. The court further found unreasonable Mr. Talanda's methods of opposing the order—by failing to carry out Overly's directive without telling her, failing to address the issue with others at KFC, secretly taping Overly's conversation and playing the tape to Bellson and refusing to explain to Malloy and Overly why he refused to carry out the order.

Because, in the district court's view, a jury could not find that Mr. Talanda's actions were reasonable, the court held that Mr. Talanda had failed to establish a genuine issue of material fact and that KFC was entitled to judgment as a matter of law.

## II

### DISCUSSION

#### A.

We review de novo the district court's entry of summary judgment. *See Harrington v. Rice Lake Weighing Sys., Inc.*, 122 F.3d 456, 458 (7th Cir.1997). Summary judgment is properly granted when the record reflects no genuine issue of material fact and the moving party, in this case KFC, is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Rothman v. Emory Univ.*, 123 F.3d 446, 450 (7th Cir. 1997). The party opposing the motion, in this case Mr. Talanda, can avoid summary judgment only by setting forth "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Vanasco v. National–Louis Univ.*, 137 F.3d 962, 964–65 (7th Cir.1998). In assessing whether there is

a genuine issue of material fact, we are obliged to examine the record in the light most favorable to Mr. Talanda, the party against whom summary judgment was decided, and to grant him the benefit of every reasonable inference that can be drawn from those facts. *See Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 505 (7th Cir.1998). Summary judgment should be denied if the dispute is "genuine": "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). When the case before us is a summary judgment ruling in an employment discrimination case, in which credibility and intent are crucial issues, we review the record with heightened scrutiny. *See Vanasco*, 137 F.3d 962, 964–65; *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir.1994).

#### B.

The ADA is a broadsweeping protective statute requiring the elimination of discrimination against individuals with disabilities. *See* 42 U.S.C. §§ 12101–213; *Duda v. Board of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1058 (7th Cir.1998). Section 12203 of the ADA prohibits acts of retaliation against employees who oppose the discriminatory practices of employers:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a).

In assessing whether Mr. Talanda has established a discriminatory retaliation claim under the ADA, the case law of Title VII serves as a useful guide because its proscription against retaliation is quite comparable to the ADA's. *See Davidson*, 133 F.3d at 511. An employee demonstrating a prima facie case of retaliation under the ADA, as under Title VII, "must establish that (1) he engaged in statutorily protected expression; (2) he suffered an adverse action; and (3) there is a causal link between the protected expression and the adverse action." *Roth v. Lutheran Gen. Hosp.*, 57

F.3d 1446, 1459 (7th Cir.1995) (citing cases). If the employee is successful at that level, to prevail ultimately he "must also rebut the defendants' nondiscriminatory reasons for the adverse action and establish that a discriminatory motive was the determining factor behind the defendants' action." *Id.*[8]

The district court focused on the first prong of the prima facie case, the requirement that a plaintiff prove that he engaged in statutorily protected expression. The court determined that the statute's protection is not absolute, that it protects only the plaintiff with a reasonable belief that he is opposing discrimination. It then held that Mr. Talanda's conduct was not protected under the statute because it was doubly unreasonable: His belief that he was opposing a discriminatory order was unreasonable and his methods of opposing KFC's actions were also unreasonable.

■ Many retaliation claims involve an employer's discharge of an employee in retaliation for that employee's filing of an EEOC charge or other employment complaint against the employer.[9] In this case, however, Mr. Talanda contends that KFC discharged him in retaliation for his opposition to an "act ... made unlawful by this chapter" against *another* employee on the basis of

her disability: i.e., his refusal to move the cosmetically disfigured employee, Dorothy Bellson, from the front counter of his KFC restaurant. It is a well-established principle that, to receive protection under the ADA, a plaintiff must have acted "in good faith and *with a reasonable and sincere belief that he or she is opposing unlawful discrimination*." *Roth*, 57 F.3d at 1459 (emphasis added). Specifically, in retaliation cases, whether under Title VII or the ADA, "it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry." *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1182 (7th Cir.1982).[10]

### C.

■ Mr. Talanda asserts that he reasonably believed that he was opposing unlawful discrimination against Bellson, an individual who, because of her severe facial disfigurement, either had an impairment or was regarded by KFC as having an impairment that constitutes a disability under the ADA. In order for an impairment, actual or perceived, to constitute a disability that is protected under the ADA, however, the impairment must be one that "substantially limits one or more of the major life activities" under the ADA. 42 U.S.C. § 12102(2)(A);[11] *see Homeyer v. Stanley Tulchin Assocs.*, 91

---

8. Mr. Talanda urges that this case involves direct evidence of retaliation on the part of KFC. In his view, therefore, he ought to prevail unless KFC can establish that his discharge would have been justified entirely by other reasons. Cf. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). We think that this analytical approach is closed to Mr. Talanda. As we explain in the following text, we believe that the district court was correct in determining that Mr. Talanda did not have a reasonable basis for his belief that KFC was engaging in discrimination toward Bellson. Under those circumstances, we think it is clear that Mr. Talanda does not have any direct evidence of retaliation with respect to the underlying employment action.

Therefore, it makes no difference whether we characterize this litigation as involving the "direct" or "indirect" method of establishing retaliation. Under either approach, Mr. Talanda cannot prevail because he has failed to establish that one reasonably can characterize KFC's underlying action toward Bellson as discriminatory.

9. See, e.g., *Hunt–Golliday v. Metropolitan Water Reclamation Dist.*, 104 F.3d 1004, 1014–15 (7th Cir.1997); *Smart v. Ball State Univ.*, 89 F.3d 437,

440–41 (7th Cir.1996); cf. *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 (7th Cir.1996) (post-termination retaliation case).

10. See also *Hunt–Golliday*, 104 F.3d at 1014; *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir.1994); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1314–15 (7th Cir. 1989); *Jennings v. Tinley Park Community Consol. Sch. Dist. No. 146*, 796 F.2d 962, 967 (7th Cir.1986), *cert. denied*, 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d 502 (1987); *Berg v. La Crosse Cooler Co.*, 612 F.2d 1041, 1045–46 (7th Cir. 1980).

11. The ADA defines the "disability" of an individual as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. 12102(2); *see also* 29 C.F.R. § 1630.2(g) (defining "disability"); 29 C.F.R. § 1630.2(h) (defining "physical or mental impairment" as "[a]ny physiological disorder, or

F.3d 959, 961 (7th Cir.1996). It is this " 'major life activities' hurdle, rather than proof of a concrete disability, [that] screens out trivial claims under § 12102(2)(C)." *Johnson v. American Chamber of Commerce Publishers*, 108 F.3d 818, 820 (7th Cir.1997).

■ Mr. Talanda's case falters at this "major life activities" criterion. "Major life activities" include such functions as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Even when an impairment does affect a major life activity, it will be considered a disability under the ADA "only if the resulting limitation is significant." *Davidson*, 133 F.3d at 506 (citing *Roth*, 57 F.3d at 1454). When considering the major life activity of "working," the EEOC regulations state explicitly that the "inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). Mr. Talanda therefore must show that he reasonably believed that Bellson was, or was perceived by KFC as, "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Id.*; *see Davidson*, 133 F.3d at 506

(quoting that regulation); *Homeyer*, 91 F.3d at 961 ("An inability to perform a particular job for a particular employer is not sufficient to establish a substantial limitation on the ability to work; rather, the impairment must substantially limit employment generally." (internal quotations and citations omitted)).

■ The evidence of record simply will not support Mr. Talanda's contention. Overly objected solely to Bellson's working at the front counter. Her demand that Bellson be moved from that position did not include any limitation on her ability to work at any other job.[12] Notably, nothing in the record suggests that moving her from the front counter was a demotion or an adverse employment action, one that would segregate her or keep her from advancing in the business. Mr. Talanda has offered no evidence from which he reasonably might have inferred that Bellson's missing teeth precluded her from holding other comparable positions. Indeed, as Mr. Talanda was aware, Bellson herself insisted that she was not disabled and was not substantially limited in her work or her ability to work; in fact, the cook and prep job in the kitchen was the job she preferred. Under these circumstances, Mr. Talanda ought to have realized that Bellson's missing teeth did not limit her in the performance of a major life activity.[13] He also should have

condition, *cosmetic disfigurement"* (emphasis added)).

**12.** At the hearing before the Illinois Department of Employment Security, Mr. Talanda admitted that he could have accommodated Overly's request that Bellson be moved from the front counter.

**13.** We do not mean to imply that facial disfigurement, including facial disfigurement caused by dental problems, can never be a disability for purposes of the ADA. Such an impairment can be so severe as to limit, or be perceived as limiting, the employee in a major life activity. *See, e.g.*, examples from the EEOC's Appendix to Part 1630, 29 C.F.R. Pt. 1630 App. § 1630.15(a) (noting that disparate treatment occurs when an employer excludes an employee with a severe facial disfigurement from staff meetings because the employer does not like to look at the employee; the employer treated the employee differently because of the employer's attitude toward his perceived impairment); and 29 C.F.R. Pt. 1630 App. § 1630.2(*l*) (noting that a prominent facial scar or involuntary head jerk may be perceived as an impairment that substantially limits a major life activity when an employer discriminates

against the person because of the complaints of customers). As with all impairments, however, it must be established that the impairment limits a major life activity or is perceived as limiting a major life activity. Here, as we discuss in the text, there was no rational basis to support the view that Bellson had, or that KFC perceived her as having, such a severe impairment. Cf. *Johnson v. American Chamber of Commerce Publishers*, 108 F.3d 818, 820 (7th Cir.1997) (questioning whether, if a plaintiff with missing teeth mumbles, his mumbling "substantially limits one or more of the major life activities"; concluding that mumbling or stuttering would preclude employment as a telemarketer, but many other jobs would remain open).

Mr. Talanda places significant reliance on our decision in *Johnson*. A precise reading of *Johnson*, however, offers no support for Mr. Talanda's contention that he reasonably believed that Bellson's lack of teeth was a disability as that term is defined in the ADA. In *Johnson*, this court reversed the district court's determination that the plaintiff's missing teeth did not rise to the level of a "cosmetic disfigurement" and therefore that the plaintiff had failed to establish that he had an impairment under the ADA. Our reversal was

known that Bellson did not perceive herself as the object of discrimination. Therefore, we must conclude that it was unreasonable for Mr. Talanda to believe that KFC regarded and treated Bellson as one who had a physical impairment that substantially limited her in a major life function and then discriminated against her because of that perceived disability.

Mr. Talanda has failed to demonstrate the reasonableness of his belief that Overly's demand was evidence that she regarded and treated Bellson as having an impairment which limited Bellson's major life activity of working. Indeed, the record does not show that Mr. Talanda tried to ascertain, in any reasonable way, whether Overly's order violated the ADA. Nor did Mr. Talanda inform Overly or Malloy that he was refusing to move Bellson in order to protect her from Overly's discriminatory activity. Therefore, KFC's firing of Mr. Talanda for his refusal to move Bellson was not a discriminatory act against Mr. Talanda and was not protected under the ADA.[14]

### Conclusion

For the reasons given above, we affirm the district court's judgment granting summary judgment in favor of KFC.

AFFIRMED.

based on the district court's misapprehension that a person could not be regarded as having a disability unless that person actually had the disability. *Id.* at 819. We therefore made clear that a person need not actually have the impairment to be perceived as having it. As we have pointed out in the text, in this case, as in *Johnson,* in order to fall within the protection of the ADA, the person must be perceived as having an impairment that limits a major life activity.

14. Because we hold that the record establishes as a matter of law that Mr. Talanda did not have a reasonable basis for believing that KFC had violated the ADA, we need not assess whether Mr. Talanda's methods of protesting Bellson's treatment—his keeping Bellson at the front counter after Overly ordered her moved; secretly recording the phone call with Overly and playing it to Bellson; and failing to explain why he did not carry out Overly's order—were unreasonable.