Raymond D. WRIGHT, Plaintiff–Appellant,

v.

ILLINOIS DEPARTMENT OF CORRECTIONS, Defendant–Appellee.

No. 98–3585.

United States Court of Appeals, Seventh Circuit.

Argued April 23, 1999

Decided Feb. 24, 2000

Stanley E. Goldstein, Eli Karsh (argued), Liberman, Goldstein & Associates, Clayton, MO, for Plaintiff–Appellant.

Janon E. Fabiano (argued), Office of the Attorney General, Chicago, IL, for Defendant–Appellee.

Before BAUER, RIPPLE and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.

Raymond Wright brought this action against the Illinois Department of Corrections ("the Department"). He alleged that the Department violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, by refusing to hire him because of his disability. The district court granted summary judgment for the Department, and Mr. Wright appeals. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

In August 1994, Raymond Wright applied for a position as a correctional officer with the Illinois Department of Corrections. On his application, he checked a box indicating that he was a veteran with a service-connected disability.[1] On August 12, 1994, Mr. Wright went through the screening process required of all applicants, including two written examinations, a five-step physical agility test, and an interview. Mr. Wright passed the written and physical tests "with flying colors." R. 27 at 7. Mr. Wright told his interviewers that he had an ankle problem and might not be able to do prolonged running. The interviewers told him that passing the physical agility test meant he was more than qualified to handle all physical aspects of the job and that he could obtain a "waiver" from any prolonged running that

might be required at the correctional officer training Academy. Because Mr. Wright successfully proceeded through the screening process and the Department's further evaluation of his application, he was placed on the Department's list of persons eligible for employment.

On March 29, 1995, the Robinson Correctional Center ("Robinson") gave Mr. Wright an offer of employment that was conditional on his successful completion of a drug test and a medical exam. On April 21, he reported to Robinson for an orientation session. Mr. Wright informed the orientation leaders that he had a disability that prevented him from standing, sitting, or walking for any length of time. When one of the other new recruits inquired about the "night life" in Springfield (where the training Academy is located), the orientation leaders stated that the evening hours would be occupied with various training exercises, including marching. Mr. Wright then threw his right arm in the air and said, "cha-ching, I'm outta there." R.27, Ex. 5. When the orientation leaders asked what he meant, he reiterated that he had a standing, sitting, and walking disability. He also stated that his screening interviewers had told him that he would not have to do prolonged running at the Academy. The orientation leaders then said he would need a note from his doctor to be exempt from prolonged running. At the conclusion of the orientation, Mr. Wright and the other candidates were instructed to report to Robinson on April 25 for the physical exam.

Mr. Wright alleges that, when he returned home after orientation on April 21, he received a phone call from Lynnette Jones of the Department's Personnel Office stating that the Department had "overlooked" his "disability" and that he would not be hired because of it. R.27 at 4. Mr. Wright alleges that he then called

---

1. In 1989, Mr. Wright was honorably discharged from the United States Marine Corps due to an ankle injury that he sustained while playing volleyball at a Navy weapons station.

Illinois State Representative Chuck Hartke's office, which in turn made a call to the Department. This second call resulted in the Department's scheduling Mr. Wright for a special medical exam. On April 24, Personnel Representative Carolyn Ochs wrote a memorandum to Administrative Assistant Charles Williams regarding "Pending COT Hire—Raymond Wright." R.27, Ex.5. The memo informed Williams that, on April 21, Mr. Wright had inquired whether paperwork was needed for his medical disability, that his application indicated he was a veteran with a service-connected disability, and that he stated that he could not stand, sit, or walk for any length of time.

On April 27, Lynnette Jones wrote a letter to Dr. Quigg confirming a pre-employment physical exam scheduled for Mr. Wright for May 3, 1995, at 10:30 a.m. The letter stated that Mr. Wright had applied to become a correctional officer and that, due to an ankle injury, he had restrictions on standing, sitting, and walking that would prevent him from marching. Jones included with the letter a description of the six-week training regimen for correctional officers and asked Dr. Quigg to determine whether Mr. Wright would be capable of performing the duties required of a correctional officer. The Department contacted Mr. Wright by phone and by mail to notify him of his May 3 appointment with Dr. Quigg.

On May 3, Mr. Wright arrived late for his appointment at Dr. Quigg's office because he had spent the day attending to preparations for his upcoming wedding. The parties dispute whether he was an hour or two and a half hours late. In any event, Dr. Quigg refused to see him and told him to contact the Department to reschedule. The next day, Mr. Wright contacted the Department and was told by Rick Dunbar that another exam would be scheduled but that he would miss the May 8 starting date and would have to wait until the next entering class. Mr. Dunbar later called Mr. Wright to inform him that he was being removed from the eligibility list, and Mr. Wright received a letter to the same effect at the end of May.

## B. Holding of the District Court

The district court granted summary judgment for the Department. The court first held that Mr. Wright had not established that he was disabled within the meaning of the ADA because he neither produced evidence that his ankle injury was an impairment that substantially limited a major life activity nor adequately demonstrated that he was regarded as having such an impairment. The court also rejected Mr. Wright's contention that the Department discriminated against him because of his disability by scheduling him for a special appointment with Dr. Quigg rather than giving him the same routine physical exam that the other candidates received. In the court's view, the record plainly showed that the special appointment was scheduled in response to Mr. Wright's complaints and in an effort to determine how his ankle condition would affect his ability to participate in training and to perform the duties of a correctional officer.

Finally, the court held, even if Mr. Wright had established a prima facie case of discrimination, the Department was still entitled to summary judgment. The Department had articulated a legitimate nondiscriminatory reason for removing Mr. Wright from the eligibility list, and Mr. Wright had presented no evidence that the proffered reason was pretextual.

## II

## DISCUSSION

### A.

■ We review de novo the district court's decision to grant summary judgment to the defendant. *See Talanda v. KFC Nat'l Management Co.*, 140 F.3d 1090, 1095 (7th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 164, 142 L.Ed.2d 134

(1998). The grant of summary judgment will be affirmed only if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Talanda,* 140 F.3d at 1095. When determining whether the evidence of record would allow a reasonable jury to return a verdict for the nonmoving party, Mr. Wright, we must review the facts in the light most favorable to Mr. Wright and draw all reasonable inferences in his favor. *See Murphy v. ITT Educ. Servs., Inc.,* 176 F.3d 934, 935 (7th Cir.1999); *Talanda,* 140 F.3d at 1095. Because issues of intent and credibility are especially crucial in employment discrimination cases, we must apply this summary judgment standard with added vigor. *See Talanda,* 140 F.3d at 1095; *Vanasco v. National–Louis Univ.,* 137 F.3d 962, 965 (7th Cir.1998).

### B.

■ The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). There are two types of disability discrimination claims under the ADA: disparate treatment claims and failure to accommodate claims. *See Foster v. Arthur Andersen, LLP,* 168 F.3d 1029, 1032 (7th Cir. 1999); *Weigel v. Target Stores,* 122 F.3d 461, 464 (7th Cir.1997). Mr. Wright advances both types of claims in this case: He alleges that the Department refused to hire him because of his disability and that the Department failed to interact with him regarding a possible accommodation at the training Academy.

■ In order to establish a prima facie case of either disparate treatment or failure to accommodate, a plaintiff must first demonstrate that he has a "disability" within the meaning of the ADA. *See Foster,* 168 F.3d at 1032; *DeLuca v. Winer*

*Indus., Inc.,* 53 F.3d 793, 797 (7th Cir. 1995). The ADA provides a definition of "disability":

> The term "disability" means, with respect to an individual—
>
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Mr. Wright does not argue that his ankle injury is an impairment that substantially limits a major life activity or that he has a record of such an impairment. Instead, he relies on the third definition of disability: "being regarded as having" an impairment that substantially limits one or more major life activities.

The regulations promulgated under the ADA provide further guidance on what it means to be "regarded as" having a disability under the ADA:

> (*l*) *Is regarded as having such an impairment* means:
>
> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
>
> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
>
> (3) Has none of the impairments defined in paragraphs (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(*l*). The Interpretive Guidance provided in the regulations states:

> The third part of the [statutory] definition [of "disability"] provides that an individual who is regarded ... as having an impairment that substantially limits a major life activity is an individual with a disability.
>
> . . . .
>
> ... For example, suppose an employee has controlled high blood pressure that is not substantially limiting. If an employer reassigns the individual to less strenuous work because of unsubstantiated fears that the individual will suffer a heart attack if he or she continues to perform strenuous work, the employer would be regarding the individual as disabled.
>
> . . . .
>
> The rationale for the "regarded as" part of the definition of disability was articulated by the Supreme Court in the context of the Rehabilitation Act of 1973 in *School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). The Court noted that, although an individual may have an impairment that does not in fact substantially limit a major life activity, the reaction of others may prove just as disabling. "Such an impairment might not diminish a person's physical or mental capabilities, but could nevertheless substantially limit that person's ability to work as a result of the negative reactions of others to the impairment." 480 U.S. at 283, 107 S.Ct. 1123.
>
> . . . .
>
> Therefore, if an individual can show that an employer or other covered entity

made an employment decision because of a perception of disability based on "myth, fear or stereo type," the individual will satisfy the "regarded as" part of the definition of disability. If the employer cannot articulate a non-discriminatory reason for the employment action, an inference that the employer is acting on the basis of "myth, fear or stereotype" can be drawn.

29 C.F.R.App. to Pt. 1630, at 350.

■ To demonstrate that the Department regarded him as disabled within the meaning of the ADA, Mr. Wright points to the Department's response to an interrogatory that asked "whether Defendant considered Plaintiff to be disabled." R. 27, Ex. 6 at 15. The Department answered "yes" to that interrogatory.[2] Mr. Wright submits that the Department's interrogatory answer conclusively establishes that the Department regarded him as disabled within the meaning of the ADA, or that at least it creates a genuine issue of triable fact on that issue. We cannot accept this submission. The record is replete with evidence that the Department did not regard or treat Mr. Wright's ankle condition as a "disability" as that term is defined by the ADA—that is, an impairment that substantially limits a major life activity.

It is undisputed that, at the end of the usual physical agility test, the Department considered Mr. Wright qualified to perform the physical aspects of a correctional officer's duties. The Department's records indicate that Mr. Wright, despite his ankle condition, performed successfully in a rigorous five-step physical agility test, which included a step test, a hang grip strength test, a lift and carry test, an agility test, and a push-up test.[3] Mr.

---

**2.** The interrogatory further asked: "If the answer is yes, then state when and why Defendant began to consider Plaintiff to be disabled." The Department answered: "Plaintiff's CMS 100 Employment Application shows he was discharged after an injury on the job from United Technologies Automotive. The Plaintiff's Certificate of Release or Discharge from Active Duty documents he

was Honorably Discharged due to a Physical Disability with Severance Pay." R.27, Ex.6 at 15.

**3.** The step test required the applicants to step up and down steps at a rate of 96 steps per minute for 3 minutes. The lift and carry test required the applicants to lift a box from the floor and carry it 200 feet without any rest

Wright achieved the minimum requirements of each test with room to spare. His interviewers assured him that passing the physical agility tests meant he was more than capable of handling the duties of a correctional officer, the physical aspects of which include patrolling the facility and its perimeter, monitoring inmate activity from a tower while armed with a firearm, conducting inmate, cell, and area searches, and using physical force when necessary.

A question arose only when Mr. Wright raised doubt about his ability to perform the specific physical tasks required of a trainee for the specific job in question. Even then, the Department's focus was on whether he could perform the duties required of a correctional officer in the Illinois penal system. At first, the Department took Mr. Wright at his word and informed him that, in light of his declaration that he was not up to the physical demands of the training, he would not be hired. The Department then decided to give the case a closer look. In referring Mr. Wright to a physician for further physical evaluation in light of his protestations about performing physical tasks during training, the Department directed the physician to review a description of the training program and then, after evaluating Mr. Wright, to "indicate if Mr. Wright is capable of performing all of the duties that would be required of a correctional officer." R. 27, Ex. 5.

Although Mr. Wright argues that the Department treated him as disabled by scheduling him for the appointment with Dr. Quigg, we cannot accept this argument. The Department scheduled the appointment only after Mr. Wright had himself questioned his ability to participate in certain aspects of the training program. When evaluated in this context, the Department's interrogatory response to the question whether it considered him "disabled" is clearly insufficient to create a triable issue of fact. The regulations provide that to be "regarded as" disabled under the ADA, the individual must have been treated as disabled by the covered entity. *See* 29 C.F.R. § 1630.2(*l*)(1) and (3). There is simply nothing in the record from which a reasonable trier of fact could conclude that, at any time, the Department regarded Mr. Wright as having an impairment that substantially limited a major life activity such as caring for himself or walking. The record does not demonstrate that the Department acted out of "myth, fear or stereotype" when it arranged for the examination by the doctor. 29 C.F.R. App. to Pt. 1630, at 350. To the contrary, the record as a whole shows that the Department's request was merely an attempt to ascertain the extent of Mr. Wright's claimed impairment—an impairment the Department had not even considered to be a problem until Mr. Wright raised the possibility that his earlier injuries might impede him from meeting the specific demands of the particular job for which he was applying.

Because Mr. Wright has failed to demonstrate that the Department regarded him as being substantially impaired in a major life activity,[4] he has not shown that he is disabled as defined in the ADA and

---

stops longer than 15 seconds. The agility test required the applicants to scramble to their feet, maneuver around cones, and perform squat thrusts under timed conditions.

4. We respectfully note that our dissenting colleague addresses only as an afterthought the essential question of whether the record can support the conclusion that the Department regarded Mr. Wright as being substantially impaired in a major life activity. In our view, however, this issue is central to the case and the evidence simply will not support this es-

sential element of a disability claim under the Act. Mr. Wright made it clear to those running the program that, because of the condition of his ankle, he could not participate in the particular training activities established for this particular position. He therefore was removed from the list of those eligible for this particular job. This action, either directly or by reasonable inference, will not support an allegation that the Department considered Mr. Wright as being substantially impaired in a major life activity.

cannot establish this prerequisite for claiming disability discrimination under the ADA. We therefore must affirm the district court's grant of summary judgment to the Department.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

ILANA DIAMOND ROVNER, Circuit Judge, dissenting.

My colleagues today conclude surprisingly that the record would not permit a reasonable factfinder to infer that the Department of Corrections perceived Wright to be disabled. Certainly a jury, after hearing the evidence, might conclude as my colleagues have that the Department viewed Wright as perfectly capable of working as a prison guard. However, to hold as a matter of law that this is the only permissible conclusion ignores quite strong evidence—not the least of which being the Department's own admission via interrogatory—that the Department harbored substantial reservations about Wright's ability to work. In the face of that evidence, I have no choice but to dissent.

As my colleagues emphasize, things went swimmingly for Wright in the initial stages of the employment process. He passed all of the tests that were administered at the screening session, including the fairly strenuous five-step agility test described in the majority opinion. *Ante* at 731 & n. 3; *see* Appendix of Appellant ("App.") 15 (Wright Aff. at 2 ¶ 5); App. 138–39 (Correctional Officer/Youth Supervisor Trainee Physical Agility Test). When, during the oral interview, Wright raised the possibility that he might not be able to run for lengthy periods of time because of his ankle injury, he was assured based on the test results that he would have no difficulty handling the physical demands of the job (*see ante* at 731–32) and that he could obtain a waiver releasing him from any prolonged running at the

Department's training academy. *See ante* at 728; App. 15 (Wright Aff. at 2 ¶ 6); *see also* App. 71 (Dep. of Karla Klindworth at 11); App. 85 (Dep. of Janette Routien at 22); App. 101 (Dep. of Rick Dunbar at 26); App. 113, 114 (Dep. of Harry Marshall at 12, 17). As of that juncture, then, the Department evinced no concern that Wright had any significant limitations that rendered him unqualified to serve as a corrections officer. To the contrary, Wright was placed on the eligibility list for hiring. If the record went no further, there would indeed be no basis to infer that the Department perceived him as disabled.

When Wright subsequently reported to the Robinson Correctional Center for orientation, however, rather clear hints of a different attitude began to emerge. When asked to explain the "I'm outta there" remark he purportedly made when the subject of marching came up, Wright indicated that his ankle injury prevented him from walking, sitting, or standing (and thus from running and marching) for prolonged periods of time, although, according to the Department's own report of this session, Wright seems to have also indicated that he would be "fine" as long as he had access to a gymnasium. App. 144 (April 20, 1995 IDOC Mem. from Janette Routien & Connie Clough to Chuck Williams); *see also* App. 6 (Complaint at 2 ¶ 12); App. 10 (Answer at 2 ¶ 12); App. 16 (Wright Aff. at 3 ¶ 11). Wright did not express doubt that he could otherwise handle the job, and at no time has the Department indicated that an inability to march or run for prolonged periods would leave Wright unable to work as a corrections officer. *See* App. 6 (Complaint at 2 ¶ 12); App. 10 (Answer at 2 ¶ 12); App. 15, 16 (Wright Aff. at 2, 3 ¶¶ 6–7, 11).

Yet, Wright returned home from the orientation session to find a message on his telephone answering machine from Lynette Jones, the Department's employment screening coordinator. When

Wright returned the call, Jones informed him that the Department had "overlooked" his "disability" and that he would not be hired at Robinson as a result of that disability. *Ante* at 728–29; *see* App. 16–17 (Wright Aff. at 2–3 ¶ 12). As Wright recounts the conversation, he reminded Jones that he had passed the physical agility test and assured her that he was fully capable of meeting the demands of the job. App. 16 (Wright Aff. at 2 ¶ 12.) He also asked that he be permitted to report for a physical examination with the other new Robinson hires several days later. App. 16–17 (Wright Aff. at 2–3 ¶ 12). Jones refused, reiterating that the Department was no longer considering him for employment. App. 16–17 (Wright Aff. at 2–3 ¶ 12).

Jones' remarks to Wright constitute direct evidence that the Department perceived Wright to be disabled. At that point, the Department quite obviously deemed Wright incapable of working as a correctional officer—thus its unqualified refusal to consider him further for a position at Robinson or any other correctional facility. *See, e.g., Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 303 (4th Cir. 1998); *Deane v. Pocono Medical Ctr.*, 142 F.3d 138, 149 (3d Cir.1998). My colleagues attempt to explain away this turn of events by suggesting that the Department simply "took Wright at his word and informed him that, in light of his declaration that he was not up to the physical demands of training, he would not be hired." *Ante* at 732. I must confess to being perplexed by this suggestion.

I am not certain that any reading of the record would support the inference that Wright had ever declared himself unable to surmount the physical demands of training, as my colleagues suggest he had; but, more to the point, the favorable interpretation of the record to which Wright is entitled on summary judgment is wholly inconsistent with that notion. Wright's own affidavit indicates that when the subject of running and marching was raised at the orientation, he simply asked what he would have to obtain from his physician in order to be exempted from prolonged running. App. 16 (Wright Aff. at 3 ¶ 11). (Even the report prepared by the individuals who conducted the orientation session indicates that Wright expressed reservations only with respect to marching, not with any other aspect of training or work as a correctional officer.) *See* App. 144 (April 20, 1995 IDOC Mem. from Janette Routien & Connie Clough to Chuck Williams). Wright also avers that when Jones informed him that the Department was removing him from the eligibility list in view of the "disability" which until then it had "overlooked," he repeated to her what the Department's own personnel had previously assured him: that his ability to successfully complete the agility test indicated that he was fully up to the physical rigors of the job. App. 16 (Wright Aff. at 3 ¶ 12). Moreover, when Wright demanded that he be permitted to proceed with the physical examination being administered to the other new hires—an examination during which his physical limitations presumably could have been explored—Jones refused. *Id.* at 16–17 (Wright Aff. at 3–4 ¶ 12). All of this bespeaks sudden reservations on the part of the *Department*, not Wright, that his ankle injury was disabling. The record makes perfectly clear that Wright was at most requesting an accommodation; and a reading of the record favorable to Wright makes equally clear that the Department refused.

It is true that the Department eventually relented and scheduled a physical examination for the purpose of assessing whether Wright was capable of work as a correctional officer. *See ante* at 732. What my colleagues appear to have forgotten in addressing this examination, however, is that the Department scheduled the exam only after Wright's State Representative intervened on his behalf. *See ante* at 729 ("This second call [from Wright's Representative] resulted in the Department's scheduling Mr. Wright for a

special medical exam."); App. 17 (Wright Aff. at 4 ¶ 13). A fair inference to be drawn in Wright's favor, then, is that the Department "decided to give the case a closer look" (*ante* at 732) only after Wright made trouble. My colleagues, however, posit that "[t]he Department scheduled the appointment only after Mr. Wright had himself questioned his ability to participate in certain aspects of the training program." *Ante* at 732. With respect, I submit that this notion is mistaken in two respects. First, accepting Wright's recitation of events as true, the Department scheduled the appointment after *it* not only questioned Wright's ability to train for the job, but removed him from the eligibility list altogether. *See* App. 16–17 (Wright Aff. at 3–4 ¶ 12). Second, Wright never questioned his own ability to do or train for the job; he merely questioned his ability to run or march for prolonged periods during training. *See* App. 15, 16 (Wright Aff. at 2, 3 ¶¶ 6, 11); App. 144 (April 20, 1995 IDOC Mem. from Janette Routien & Connie Clough to Chuck Williams). And at no time has the Department suggested that an inability to engage in prolonged running or marching disqualified Wright from work as a correctional officer. Wright, in fact, was given assurances to the contrary. App. 15 (Wright Aff. at 2 ¶¶ 6–7).

Should more be needed to confirm that there is a live dispute as to the Department's perception of Wright, there is—last but not least—the Department's own unqualifiedly affirmative answer to the interrogatory inquiring whether the Department considered him to be disabled. App. 190 (Answers to Plaintiff's First Set of Interrogatories Directed to Defendant at 15 No. 12). Notably, the Department's "yes" answer was not based on anything Wright purportedly said during the hiring process, but rather the disclosure on his application form that Wright had left both the Marine Corps and a subsequent job due to ankle injuries. *See id.*, No. 12a. Although this answer certainly does not amount to a binding, judicial admission

that the Department perceived Wright to be disabled (*see generally Keller v. United States*, 58 F.3d 1194, 1198–99 n. 8 (7th Cir.1995)), it nonetheless constitutes admissible evidence of that perception. *See* 4 Christopher B. Mueller and Laird C. Kirkpatrick, FEDERAL EVIDENCE § 418, at 257 (2d ed.1994). Having secured the Department's evidentiary admission that it considered him to be disabled, I am certain that it comes as quite a surprise to Wright to learn today that "[t]here is simply nothing in the record" suggesting that the Department so perceived him. *Ante* at 732. Even if there were no other evidence that the Department harbored such a perception, the interrogatory answer itself stands as such evidence.

Finally, one may readily infer from the record that the Department perceived Wright to have a substantially limiting impairment, as opposed to a more mundane one. Wright, of course, believes that his ankle problem poses nothing more than minor limitations on any of his life activities; and initially, it appeared that the Department's perception jibed with his own. Again, the only reservation that Wright ever expressed had to do with the marching and running components of the Department's training regimen; and during the screening process, Department personnel assured him that he could obtain a waiver releasing him from such activities. Yet, after the orientation session at Robinson, the Department informed Wright that he would not be hired because of the "disability" that the Department, until then, had "overlooked." This about-face suggests that the Department had come to view Wright's limitation as much more far-reaching than it did at first—so much so that it removed Wright's name from the eligibility list altogether, it refused his request that he be examined by the Department's physician along with the other trainees, and eventually (after his State Representative intervened) ordered him examined by a doctor that no other trainee saw. All of this bespeaks a perception, not

of a modest, controllable limitation, as Wright himself viewed it, but of a condition that imposed significant limitations on such major life activities as working, walking, and so on. And once again, the confirmation is supplied by the Department's interrogatory response. Citing Wright's discharge from the Marine Corps and from a subsequent job because of his injured ankle, the Department conceded that it considered Wright to be disabled. App. 190 (Answers to Plaintiff's First Set of Interrogatories Directed to Defendant at 15 No. 12). That the Department believed Wright incapable of work as a corrections officer because he had been discharged from two other (distinctly different) jobs sends a clear signal that it perceived the restrictions stemming from his ankle injuries to be substantial, rendering him unable to perform a broad class of employment. *See Riemer v. Illinois Dep't of Transp.*, 148 F.3d 800, 807 (7th Cir.1998).

Accepting Wright's version of events as true, the Department's initial confidence that he was capable of work as a correctional officer vanished when Wright began to inquire about securing a waiver from prolonged running and marching during training (as Department personnel had suggested he could). The Department removed him from the hiring eligibility list, informing him that it had "overlooked" the "disability" he had disclosed on his employment application. Later, in the course of discovery, the Department would even admit, in writing and under oath, that it considered Wright to be disabled. What more support Wright needs for the inference that the Department perceived him to be disabled is beyond me.

I respectfully dissent.