In the
United States Court of Appeals
For the Seventh Circuit

No. 99-4068

LEROY GORDON,

Plaintiff-Appellant,

v.

UNITED AIRLINES, INCORPORATED,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 1378--Harry D. Leinenweber, Judge.

Argued May 16, 2000--Decided March 29, 2001

Before EASTERBROOK, RIPPLE and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.  Leroy Gordon, a probationary flight attendant for United Airlines, Inc. ("United"), was released from his employment by the company on the ground that he had deviated without authority from his flight schedule when he did not fly a scheduled flight from Los Angeles to Seattle. The company decided that this violation of its policy, when considered in light of Mr. Gordon's overall work performance, warranted no lesser sanction. Mr. Gordon then filed this action in the district court; he alleged that United discriminated against him because of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000e et seq., and in violation of 42 U.S.C. sec. 1981, and because of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. sec. 623. The district court granted summary judgment for United, and Mr. Gordon now appeals. For the reasons set forth in the following opinion, we reverse the judgment of the district court and remand the case for proceedings consistent with this opinion.

I
BACKGROUND
A.  Facts

Leroy Gordon, an African-American male over 40 years of age, claims that United discriminated

against him because of his race and his age when it terminated his employment as a probationary flight attendant. United, however, asserts that Mr. Gordon committed a violation of company policy. According to United, that violation, when coupled with his work history, justified its decision to release Mr. Gordon from his position as a probationary flight attendant.

1.

Mr. Gordon began working at United as a Baggage Systems Operator in 1995. While working in this position, he received a Notice of Concern because he had 21 incidents of tardiness and 2 absences. Mr. Gordon questioned the validity of the allegations in this notice, but he was told that the notice would not be placed in his personnel file.

Mr. Gordon then applied for and received a transfer to United's flight attendant ("FA") program in 1996. While in training, he was 20 minutes late for a training exercise, which resulted in an incident report for failing to meet minimum dependability requirements. Mr. Gordon claims that, at that time, he was told the incident would not be made a part of his personnel record as long as there were no reoccurrences. He graduated from his training class in February 1997 and then started as a probationary flight attendant ("PFA") at Chicago O'Hare International Airport ("O'Hare"). Mr. Gordon states that his supervisor, Gina Siemieniec, told him that she would not consider his training records when evaluating him as a PFA.

In May 1997, United confronted Mr. Gordon with a check it had received from him that had been returned due to insufficient funds. Mr. Gordon had written the check in July 1996, while he was still a Baggage Systems Operator, and he claims that he thought his bank already had taken care of the matter. United informed Mr. Gordon that, if he did not pay immediately, he would be subject to disciplinary action. Mr. Gordon promptly paid. Siemieniec, who brought the matter to Mr. Gordon's attention, stated that the situation was not serious and was not relevant to his performance as an FA.

Mr. Gordon's next problem at United occurred in June 1997 when a United passenger reported that no pre-landing safety announcement had been made on his flight. The First FA is the person responsible for making the announcement, and, on this particular flight, Mr. Gordon was the First FA. In response to the passenger's complaint, Siemieniec asked Mr. Gordon for a written report.

In that report, Mr. Gordon wrote, "I believe the prearrival announcement was made by [the Second FA], just before I was about to make it." R.21, Ex.27. Mr. Gordon claims that he was assisting a wheelchair passenger and was about to make the announcement when the Second FA made it. Indeed, he asserts that the Second FA made the announcement early. According to Siemieniec, she did not issue Mr. Gordon a warning because she decided to overlook the matter.

Finally, United claims that Mr. Gordon was unresponsive to Siemieniec's requests for Mr. Gordon to meet with her. Mr. Gordon asserts that he had attempted to visit her, but that both he and Siemieniec had unusual schedules. Siemieniec responded that the PFAs bore the responsibility for making an appointment to meet with her if they were unable to find her in her office.

We note several other relevant factors about Mr. Gordon's record at United. First, while a PFA, Mr. Gordon never received an "Interim Evaluation." An Interim Evaluation typically is given to an employee for substandard performance. After the employee receives the first Interim Evaluation, the second incident of unacceptable conduct by the employee will result in termination. Moreover, in Mr. Gordon's five-week reviews, no problems were ever documented. Finally, Mr. Gordon received awards as a PFA, including PRIDE awards for perfect attendance and Service in Every Sense awards for above-average customer service.

2.

The incident that led to Mr. Gordon's termination occurred on August 5-6, 1997. On August 5, Mr. Gordon was assigned to work a flight from O'Hare to Portland, Oregon, and then to fly deadhead (fly but not work) to Los Angeles International Airport ("LAX"). Once in Los Angeles, he was to be reassigned. When he arrived at LAX, he received his next assignment--a flight from Los Angeles to Seattle--that was to begin 21 hours later. He then was transported to a Days Inn where United had assigned him to stay the night so that he could rest before his next scheduled flight. In a report Mr. Gordon later wrote about the incident, he explained that he had experienced problems with his motel room at the Days Inn:

I was [given] a ground level unit. This is a drive up style motel, there was a car backed up 3 to 5 feet from my door with the engine running, so when I entered the room there were exhaust fumes present. (The car moved a short time later, but the smell remained). It was a very hot night

in L.A. ([around] 90). The room had one window style air conditioning unit in the living room, but none in the bedroom. The carpet was dirty, there were holes in the walls, and insects flying around the room. There were what appeared to be unsecured window in the bathroom and kitchen sections, and there was one TV set in the living room, (with no remote control). I did not feel this room was safe, sanitary or acceptable. I also was under the impression the flight attendant union agreement would not allow FA to be housed on first floor units for security reasons.

R.21, Ex. 30 at 1-2./1 He attempted to move to another room, but the Days Inn did not have one available. He called the United Crew Desk at LAX for help finding a room in a different hotel, but he was told that none were available at that time. Mr. Gordon also spoke with United's National Crew Desk which was unable to help him.

Mr. Gordon then returned to LAX. Upon arriving at the airport, he discovered that the United Crew Desk had closed. At this point, Mr. Gordon decided to take a red-eye flight from Los Angeles back to Chicago. As he explained in his report, "I thought this would give me an opportunity to shower, change clothes, and still return to LAX" in time to work his next scheduled flight. Id. at 2. He arrived at O'Hare at 6 a.m. on August 6, 14 hours before his scheduled flight from Los Angeles to Seattle.

In this litigation, United concedes that, at this point, Mr. Gordon had done nothing to warrant sanctions. If he had returned to Los Angeles and made his scheduled assignment, he would not have been terminated. As United states: "It is true that if Plaintiff had returned to Los Angeles and flown his scheduled flight, he would not have been subject to discipline." Appellee's Br. at 16. However, Mr. Gordon did not return to Los Angeles to work his scheduled flight.

Once Mr. Gordon returned to O'Hare, he checked in with the United Crew Desk and spoke to the Crew Desk Supervisor, Henry Velasco. According to Mr. Gordon's report, he explained the hotel problems to Velasco and "asked if [he] should return to work the trip [from Los Angeles to Seattle], or if [he] could be excused from the [trip] because [he] had not had a legal rest."/2 R.21, Gordon's Report to Siemieniec, Ex.30 at 4. Mr. Gordon informed Velasco that, if his request presented a problem, he would return to Los Angeles to make his assigned flight. Velasco told him that it would not be safe for him to return to Los Angeles that day and that it was not a problem to take him off the assignment, Mr.

Gordon wrote, but that he should discuss the situation with his supervisor. Mr. Gordon also explained in his report that he was not sure that the Crew Desk understood his request, that is, that he would be commuting to Los Angeles and not that he would be working a flight to Los Angeles. Finally, as Mr. Gordon concluded in his written report, "my improper deviation was unintentional. . . . This mistake was caused by my lack of understanding of the regulations, but my intent was not malicious in any manner." Id. at 3.

   Velasco also wrote a report for Siemieniec that discussed the incident. In that report, he explained that Mr. Gordon had been unhappy with his hotel and had been unable to contact the LAX Crew Desk. Velasco then wrote that Mr. Gordon had "decided to DV8 from LAX back to ORD [O'Hare] without authorization from any crew desk." R.21, Ex.32. Once at Chicago, the report continued, Mr. Gordon advised the O'Hare Crew Desk "that he was illegal to continue flying, as he had not had a legal rest at his original layover point at LAX." Id. Velasco stated that he explained the complications of this action and told Mr. Gordon that he needed to speak with his supervisor. The report also mentioned that Mr. Gordon offered to return to LAX to pick up the balance of his assignment. As the report noted, "I explained that I could not have him flying knowing that he had not had a rest, and would not jeopardize the safety of his flying partner, the safety of the customer, and the company." Id. Thus, Velasco wrote, he removed Mr. Gordon from the remainder of his scheduled assignment and told him to contact his supervisor.

   The deposition testimony of Velasco, although confusing, states that his role as supervisor of the Crew Desk merely consisted of documenting the actions of the PFAs and providing their supervisors with information about what had happened during their assignment. Yet, at his deposition, Velasco testified that he had told Mr. Gordon that the idea of Mr. Gordon's returning to Los Angeles was a safety issue because Mr. Gordon could jeopardize the safety of his flying partners, the customers on the flight, and United. Moreover, Velasco stated that he placed a Did Not Fly ("DNF") notation on Mr. Gordon's flight calendar. A DNF notation, according to Velasco, could mean any number of things, including a violation of United's rules. His role, he said, was merely to advise his immediate supervisor of the occurrence of the DNF.

   Before Siemieniec discharged Mr. Gordon, she consulted United's acting department manager, James Younglove, for advice on handling Mr.

Gordon's situation. Although Younglove stated Mr. Gordon's conduct "in and of itself [was] disciplinary in nature," Younglove advised Siemieniec to look at his entire record to ascertain whether any factors suggested that he was an exceptional employee that should be retained or that he had a history of problems that indicated they should not retain him. R.21, Ex.15 at 21. As Younglove explained, he would ask:

Is this someone that has made several mistakes and I shouldn't spend a lot of time on, truthfully? Or is this somebody that is an exceptional employee; that I'm looking to find out if there's anything available to us that's out of the norm with this individual? Is there any problems dealing with family that we're aware of that the employee has brought to our attention that would have placed him in this position.

Id. at 19-20.

Siemieniec considered the incident of Mr. Gordon's missed flight and reviewed Mr. Gordon's entire work history with United when making her decision to release Mr. Gordon. After reviewing Mr. Gordon's record, she released him from his position as a probationary flight attendant. Mr. Gordon thereafter filed this action for discrimination.

B.  Proceedings in the District Court/3

The district court granted summary judgment to United after determining that Mr. Gordon had failed to establish a prima facie case of discrimination. First, the court discussed the elements required for a plaintiff to survive summary judgment when he is attempting to prove discrimination indirectly./4 Under the burden-shifting standard applied to discrimination cases, the court explained, a plaintiff first must make out a prima facie case of discrimination by the employer. To make out a prima facie case, the court stated, Mr. Gordon must show "(1) he is a member of a protected class, (2) his job performance was sufficient to meet his employer's legitimate expectations, (3) his employer took an adverse employment action against him and (4) he was treated less favorably than similarly-situated, non-protected employees." R.33 at 8. Once the plaintiff has established a prima facie case, the burden then shifts to the employer to proffer a legitimate, nondiscriminatory reason for its adverse employment action. Finally, the court explained, the burden shifts back to the plaintiff, who must show that the stated reason given by the employer is a pretext for discrimination.

Next, after noting that the parties agreed that Mr. Gordon falls within a protected class for both his race discrimination and age discrimination claims, the court turned to the second factor for establishing a prima facie case: "[W]hether Gordon has raised a genuine issue of material fact such that a reasonable jury could find that Gordon's job performance was sufficient to meet United's legitimate expectations." R.33 at 9. According to the court, to establish a prima facie case, "the plaintiff cannot generally aver that he was meeting the employer's legitimate expectations; rather, the plaintiff must 'specifically refute the facts which allegedly support the employer's claim of deficient performance.'" Id. (quoting Sirvidas v. Commonwealth Edison Co., 60 F.3d 375, 378 (7th Cir. 1995)).

The court stated that Mr. Gordon was unable to show that he was fulfilling United's legitimate expectations at the time it released him from its employment. The court noted that Mr. Gordon received a Notice of Concern while a baggage handler, that he arrived late once while in training, that he wrote a check for insufficient funds, that he did not issue a pre-landing safety announcement, and that, in his terminating event, he deviated from his schedule without authorization. Although Mr. Gordon argued that he should have received only a "missed flight" warning for the terminating event, the court stated that United had explained that a missed flight designation was only for an incident that was accidental or was outside the FA's control. The court pointed out that, in Foster v. Arthur Andersen, LLP, 168 F.3d 1029, 1035 (7th Cir. 1999), we had warned that discrimination laws do not prevent employers from making adverse employment decisions although the employee may think the infraction is de minimis. As the court concluded, "Gordon admitted to not following United procedure on several occasions; consequently, as a matter of law, Gordon has not shown that he satisfied United's legitimate expectations."/5 R.33 at 10. The court then granted summary judgment for United.

II
DISCUSSION
A. Standard of Review

We review de novo the district court's grant of summary judgment for United and, viewing the facts in the light most favorable to Mr. Gordon, draw our own conclusions of law and fact from the record before us. See Downs v. World Color Press, 214 F.3d 802, 805 (7th Cir. 2000); Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir.

1993). A grant of summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Sarsha, 3 F.3d at 1038.

B.  McDonnell Douglas Indirect Method of Proof

1.

A plaintiff may show that his employer discriminated against him because of his race or his age by using the burden-shifting method set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)./6

Under McDonnell Douglas, a plaintiff first must establish a prima facie case of discrimination./7 A plaintiff establishes a prima facie case of discrimination by demonstrating that: (1) he belongs to a protected class, (2) he performed his job according to his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees outside the protected class were treated more favorably by the defendant. See Pitasi, 184 F.3d at 716; Sirvidas, 60 F.3d at 377; Hughes v. Brown, 20 F.3d 745, 746 (7th Cir. 1994). Once the plaintiff has established his prima facie case, a presumption of discrimination arises, and the burden shifts to the defendant to come forward with evidence of a legitimate, nondiscriminatory reason for discharging the plaintiff. See Pitasi, 184 F.3d at 716./8 If the defendant meets its burden, the burden shifts back to the plaintiff to show that the defendant's stated reason for the adverse action was a pretext for discrimination. See McDonnell Douglas, 411 U.S. at 804; Stewart, 207 F.3d at 376; Pitasi, 184 F.3d at 716. If the plaintiff meets his respective burdens under McDonnell Douglas, summary judgment is inappropriate; a plaintiff need not come forward with direct evidence of discrimination in order to survive summary judgment. See Vanasco v. National-Louis Univ., 137 F.3d 962, 965 (7th Cir. 1998) ("The plaintiff may prove her case in one of two ways--through direct evidence or via the indirect burden-shifting method of McDonnell Douglas . . . . Under either method, summary judgment is improper if the plaintiff offers evidence from which an inference of age discrimination may be drawn.") (internal quotation marks and citations omitted).

2.

At the outset, we note that not all elements of the McDonnell Douglas analysis are at issue. The parties do not dispute that Mr. Gordon belongs to

a protected class or that he suffered an adverse employment action. Therefore, in determining whether Mr. Gordon has established a prima facie case, we need to consider only (1) whether Mr. Gordon was meeting the legitimate expectations of United at the time of his discharge and (2) whether similarly situated employees outside the protected class were treated more favorably. See Pitasi, 184 F.3d at 716.

a.

We first turn to whether Mr. Gordon was meeting the legitimate expectations of United. As we have pointed out on several occasions, this issue of satisfactory job performance often focuses on the same circumstances as must be scrutinized with respect to the matter of pretext./9 Consequently, we will address the issue more comprehensively when we discuss pretext. Nevertheless, several factors ought to be pointed out here.

First, to put it mildly, United has not spoken with one voice in defining what sort of activity by a flight attendant constitutes an unauthorized deviation. The record discloses a distinct inability on the part of United's management to provide any consistent definition. Different individuals in management positions articulated very different views on what sort of activity on the part of an employee constituted this violation of United's Code of Conduct. Indeed, it is no wonder that United had difficulty in articulating a definition because, apparently, it had charged an employee with this offense only once before (and, in the prior situation, determined that discharge of the employee was not appropriate).

We ordinarily would defer to the definition of the decision-maker in such a situation. However, the material before us on summary judgment is clearly susceptible to the interpretation that the individual who made the decision to terminate Mr. Gordon actually came to no independent conclusion on the matter but simply accepted the conclusion of lower ranking administrative personnel on this important, indeed key, definitional matter. Even if we were to assume that the decision-maker applied her own definition of unauthorized deviation, it is not at all clear that Mr. Gordon committed such an infraction. His account of his conversation with Velasco certainly would permit the trier of fact to conclude that he believed in good faith that he had sought and had been granted permission not to fly the LAX to Seattle leg that he had been assigned previously.

In short, the invocation of an offense that, to this day, United has difficulty defining, the lack of any clear management decision that Mr. Gordon's conduct violated clearly established norms, and Mr. Gordon's detailed account that he acted only with the permission of those responsible for the coordination of flight attendant assignments raise a genuine issue of material fact as to whether he had deviated at all from permissible patterns of behavior for flight attendants.

Finally, United points to incidents in Mr. Gordon's work history at United to support its contention that Mr. Gordon was not performing satisfactorily. When combining his work record with his unauthorized deviation, United asserts, it is clear that Mr. Gordon fails to meet this aspect of his prima facie case. Here too, however, there is a dispute as to whether United deviated from its established policy in considering past incidents after it had assured Mr. Gordon that these incidents would not be a matter of record. Mr. Gordon claims that his work record was not supposed to contain a notation of these incidents, and indeed, that United affirmatively had assured him that these matters would not be used in evaluations of his performance as a PFA. Moreover, Mr. Gordon asserts that all but one of these incidents were not relevant to his performance as a PFA. The remaining incident, his failure to provide the safety announcement when he was the First FA was not, according to Mr. Gordon, an infraction. Not only did Siemieniec tell Mr. Gordon that she would not include a report on the incident in his record, but the reports from the other FAs on the flight also indicate that Mr. Gordon did nothing wrong. Furthermore, United's rules of procedure state that both the First FA and the Second FA are responsible for giving the announcement. Here, the Second FA explained that she had given the announcement and admitted that she had given it early. Therefore, viewing the record in the light most favorable to Mr. Gordon, his personnel file should not have contained a record of any infractions. His personnel file did show, however, many commendations. Consequently, a trier of fact could conclude on this record that Mr. Gordon was performing up to United's expectations.

b.

The fourth prong of the McDonnell Douglas analysis requires that Mr. Gordon establish that similarly situated employees outside the protected class were treated differently. We conclude that there is a genuine issue of triable fact on this matter as well. Mr. Gordon points to

two different groups of similarly situated, non-protected employees who were treated more favorably than he. First, he and only one other PFA in United's history have been charged with "unauthorized deviation." The other PFA to receive such a designation was a white female, and United did not discharge her after her unauthorized deviation. Instead, it issued her a warning and allowed her to remain with United. Despite the absence of any warnings in his record, Mr. Gordon was terminated for the same conduct that resulted in only a warning for a white female employee. Although United suggests that the other PFA's conduct was far less intentional, that conclusion is dependent upon the trier of fact's interpretation of Mr. Gordon's encounter with Velasco. As we already have noted, this encounter is open to different interpretations.

Indeed, several other employees may well have been similarly situated to Mr. Gordon. These flight attendants all had missed flights unintentionally. If a trier of fact were to determine that Mr. Gordon had missed his assigned flight unintentionally--a conclusion supportable by the record--, he is similarly situated to these employees but was treated less favorably than they./10 Indeed, unlike Mr. Gordon, several of these PFAs already had warnings in their records at the time of their missed flights; United nevertheless characterized their actions as "missed flights" instead of "unauthorized deviations." A trier of fact reasonably could determine that Mr. Gordon, like the other flight attendants, simply missed a flight but was treated differently from the other flight attendants. Drawing all reasonable inferences in Mr. Gordon's favor, we must conclude that Mr. Gordon has demonstrated that there is a genuine issue of triable fact as to whether similarly situated employees outside the protected class were treated differently.

3.

Assuming that United has offered a facially legitimate reason for Mr. Gordon's discharge, his unauthorized deviation, we now turn to whether Mr. Gordon has demonstrated that United's stated reason is a pretext for discrimination. See McDonnell Douglas, 411 U.S. at 804; Stewart, 207 F.3d at 376; Pitasi, 184 F.3d at 716.

a.

To show pretext, Mr. Gordon bears the burden of demonstrating that United's ostensible justification for its decision is unworthy of credence. See Reeves v. Sanderson Plumbing

Products, Inc., 530 U.S. 133, 143 (2000); Adreani v. First Colonial Bankshares Corp., 154 F.3d 389, 395 (7th Cir. 1998); see also Sanchez v. Henderson, 188 F.3d 740, 746 (7th Cir. 1999) (stating that a plaintiff can show pretext "by showing that the employer's proffered reason was not worthy of belief"), cert. denied, 528 U.S. 1173 (2000). Mr. Gordon may make the requisite showing by providing "evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." Adreani, 154 F.3d at 395 (internal quotation marks and citations omitted); see also Sanchez, 188 F.3d at 746.

If United honestly believed its reason for discharging Mr. Gordon, Mr. Gordon cannot meet his burden. See Roberts v. Separators, Inc., 172 F.3d 448, 453 (7th Cir. 1999). This is true even if United's reason for Mr. Gordon's discharge was "foolish or trivial or even baseless"; as long as United honestly believed its reason, then summary judgment for United is appropriate. Brill v. Lante Corp., 119 F.3d 1266, 1270 (7th Cir. 1997); see also Crim v. Board of Educ. of Cairo Sch. Dist. No. 1, 147 F.3d 535, 541 (7th Cir. 1998) (explaining that it is not enough for the plaintiff to prove that the employer's reason was doubtful or mistaken). Title VII sanctions employers who discriminate, not those who are simply inept or incompetent.

Our cases have warned, repeatedly, that we do not sit as a superpersonnel department that will second guess an employer's business decision. See Stewart, 207 F.3d at 378. However, we need not abandon good reason and common sense in assessing an employer's actions. Indeed, we have stated that a "determination of whether a belief is honest is often conflated with analysis of reasonableness," Flores v. Preferred Technical Group, 182 F.3d 512, 516 (7th Cir. 1999); "the more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held," id. Our cases therefore have acknowledged that we need not take an employer at its word. For instance, we have held that when an employee provides "[a] detailed refutation of events which underlie the employer's negative performance assessment," the employee demonstrates "that the employer may not have honestly relied on the identified deficiencies in making its decision." Day v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1460-61 (7th Cir. 1994). Furthermore, "[i]f the employee offers specific evidence from which the finder of fact may reasonably infer that the proffered reasons do not represent the truth, the case then turns on the credibility of the

witnesses." Collier v. Budd Co., 66 F.3d 886, 893 (7th Cir. 1995). In such circumstances, the employee creates "a factual issue as to whether the employer's explanation is credible or merely a pretext for discrimination." Day, 28 F.3d at 1461. "[W]hen the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a fact finder may reasonably infer that unlawful discrimination was the true motivation . . . ." Adreani, 154 F.3d at 395 (citations omitted).

b.

   In the present case, United's proffered justification for firing Mr. Gordon is his "unauthorized deviation." Our review of the record reveals inconsistencies in definition and disparities in application that call into question United's proffered justification and make summary judgment inappropriate.

1.

   Mr. Gordon admits that he did not receive authorization before leaving Los Angeles to fly to Chicago. United now admits that, even though he had not received authorization, if he had returned to Los Angeles to make his scheduled flight, he would not have made an unauthorized deviation. United determined, however, that Mr. Gordon's conduct constituted an unauthorized deviation./11

   The record makes starkly clear that, at the time of the incident, United did not have a clear definition of what constitutes an "unauthorized deviation." Apparently, the term is not defined in any United manual. Furthermore, the individuals involved in Mr. Gordon's discharge employed different definitions of the term.

   Velasco offered a conflicting definition of unauthorized deviation from that of Siemieniec, the person who discharged Mr. Gordon. Velasco stated that a person commits an unauthorized deviation when he is on a layover and without authorization flies to another city, even if he returns to the city of his layover and makes his scheduled flight. Siemieniec explained in her deposition, however, that a flight attendant could fly to a different city while on a layover and return to his departure city without committing an unauthorized deviation. Siemieniec supported her definition by stating that "[p]rovided he is back in position for his scheduled flight, he has not deviated." R.23, Siemieniec dep. I, at 81.

   James Younglove, the department's acting

manager, echoed Siemieniec's deposition position that, if Mr. Gordon had flown home and returned in time to make his next scheduled flight, he would not have violated any United rule "[a]s long as he [was] back in their [sic] position to fly his trip." R.21, Ex.15 at 46. Similarly, Glen Scoggins, a senior staff representative for labor relations, was presented with the following hypothetical: "If a flight attendant is on layover and is scheduled to fly out of my hypothetical city at 8:00 at night . . . that flight attendant took a plane to Pittsburgh, had lunch, got back to the city in which she was scheduled to fly out of in time to make her flight, has that flight attendant violated United's articles of conduct?" R.23, Scoggins dep., at 19-20. Scoggins replied: "I do not believe they violated the articles of conduct." Id. at 20. Indeed, United in its appellate brief flatly admits that the conduct that Velasco describes as an unauthorized deviation does not constitute such an infraction.

The inconsistent definition of unauthorized deviation becomes even more troubling in light of several other events. First, Siemieniec relied upon Velasco's definition of unauthorized deviation as a justification for firing Mr. Gordon, even though, according to her own deposition, she did not believe that his definition or the facts he alleged constituted an unauthorized deviation. Siemieniec's application of a different definition than the one she articulated in her deposition raises a significant question about the truthfulness of United's proffered reason for the discharge.

Second, the unauthorized deviation infraction has been invoked rarely. United's decision to characterize Mr. Gordon's conduct as an "unauthorized deviation" was an almost unprecedented occurrence. Other employees, who engaged in facially similar conduct, received only interim warnings because their conduct was deemed a "missed flight." It is not the province of this court to question an employer's decision to punish some conduct more harshly than other conduct. Nevertheless, we are not bound by the labels that an employer uses and must scrutinize the conduct behind those labels to determine if they are applied to similar conduct. Cf. Johnson v. Zema Sys. Corp., 170 F.3d 734, 743 (7th Cir. 1999) (stating that "[a]n employer cannot insulate itself from claims of racial discrimination simply by providing different job titles to each of its employees" and then deny the existence of similarly situated employees). Here, an employer applied a rarely used label to sanction conduct that does not clearly fall within the chosen category. Although this alone

may not cast doubt on United's sincerity, when considered together with the inconsistency noted above, it is sufficient evidence of pretext and, therefore, precludes summary judgment. See Perdomo v. Browner, 67 F.3d 140, 145 (7th Cir. 1995) ("Because a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes a summary judgment.").

2.

However, although our analysis could stop here, there is additional evidence of pretext. United's proffered reason for discharge is further placed in question because no one claims responsibility for making the determination that an unauthorized deviation actually took place. Velasco stated that, in his role as Supervisor of the Crew Desk, he had no authority to make decisions; instead, he merely acted as a conduit to Mr. Gordon's supervisors. Velasco wrote in his report to Siemieniec that Mr. Gordon "decided to DV8 from LAX back to ORD [O'Hare] without authorization from any crew desk," R.21, Ex.32; yet, as Mr. Velasco repeatedly stated in his deposition, he had no decision-making authority and his role was only to provide "information as to what happen[ed] during their assignment and that is it." R.23, Velasco dep. I, at 68./12

United's other supervisors, however, all claim that they did not make the decision that Mr. Gordon committed an unauthorized deviation. When Siemieniec was asked what factors she considered in making the determination that Mr. Gordon deviated without authorization, she replied: "That was already complete by the time I got involved. That was something he was dealing with at the moment at the crew desk. That determination was between him and Henry [Velasco] at the crew desk." R.28, Ex.49 at 40. She then stated that "Mr. Gordon unauthorized his own deviation." Id./13 These protestations, when considered together with the lack of coherent definition of unauthorized deviation cast significant and substantial doubt on United's assertion that it honestly believed Mr. Gordon committed an unauthorized deviation. As a result, these circumstances demonstrate triable issues of fact as to whether United's justification of its discharge of Mr. Gordon is "unworthy of credence" and therefore "probative of intentional discrimination." Reeves, 530 U.S. at 147.

We also note that Mr. Gordon and Velasco offer different accounts of the events leading to Mr. Gordon's unauthorized deviation, a disparity which is relevant to the issue of whether United's proffered reason for discharge is a

credible one. Mr. Gordon states that, after a bad experience at his hotel, he presented himself to the Crew Desk to ask permission to be released from his next assignment. Velasco acknowledges that Mr. Gordon's hotel experience was troubling but states that Mr. Gordon presented himself as illegal to fly. Mr. Gordon admits that he said he did not have a legal rest. He also states that he clearly would have had a legal rest by the time of his next flight and that Velasco had to have known that because Velasco had Mr. Gordon's schedule in front of him on his computer screen. It is undisputed that Mr. Gordon offered to return to Los Angeles to complete his scheduled assignment.

Therefore, the two individuals present at the time Mr. Gordon committed his alleged unauthorized deviation do not agree on the material facts of the occurrence. Mr. Gordon claims that he could have flown, and offered to fly, his next assigned flight. He states that he thought he received permission from Velasco to be removed. Velasco, conversely, states that Mr. Gordon presented himself as unable to fly his next assignment. United therefore claims that Mr. Gordon's removal was not authorized. There is, therefore, a genuine issue of triable fact because, when a PFA deviates from his assignment with authorization, it is not an infraction. As Siemieniec states, when flight attendants "get permission to take a different flight or do other than what they're scheduled to do then it is not unauthorized." R.23, Siemieniec dep. I, at 82./14 According to Mr. Gordon, he asked for authority from Velasco to miss his next flight and Velasco seemingly provided that authorization.

3.

Finally, the weakness of the proffered justification for the termination is further emphasized by the fact that the only other time that United has categorized an action as an unauthorized deviation, the involved employee, a white female, was not terminated. "A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for racial discrimination." Graham v. Long Island R.R., 230 F.3d 34, 43 (2d Cir. 2000); see also Williams v. City of Valdosta, 689 F.2d 964, 975 (11th Cir. 1982) ("It is undisputed, however, that the City's adherence to its formal promotional policy was inconsistent and arbitrary at best. This inconsistency supports the conclusion that resort to the

examination requirement was a pretext for singling out Williams for unfavorable treatment.").

4.

We note that in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142-46 (2000), the Supreme Court, reinstating a jury verdict in favor of the employee, engaged in a similar factual analysis to ours in the present action to determine that a company's explanation for its employment decision was suggestive of intentional discrimination. In Reeves, the employer contended that its discharge of the employee was due to a non-discriminatory reason: the employee's failure to maintain accurate attendance records of those under his supervision. See id. at 138. Reviewing in detail the record before it, the Court determined that, contrary to the employer's assertion, the evidence permitted the jury to conclude that the employee did maintain proper records and was not responsible for any failure to discipline late or absent employees. See id. at 144-47. As a result, the Court determined that sufficient evidence existed to sustain a jury's determination that the employer's asserted justification was not true. See id. at 154-55.

As in Reeves, Mr. Gordon has raised a factual issue as to whether "the employer's explanation is credible or merely a pretext for discrimination." Day, 28 F.3d at 1461. Mr. Gordon's argument that his discharge for unauthorized deviation was pretextual is not based on a contention that United simply misapplied its policy or that its decision-makers were confused. To so argue would be to misstate the record before us./15 Although United certainly ought to be permitted to argue such managerial ineptness to the jury, on summary judgment we must remember that Mr. Gordon suggests another, and equally plausible, characterization of the record. Our faithful adherence to the Supreme Court's holding in Reeves will tolerate no other conclusion. A reasonable jury could conclude, given United's inconsistent definition of unauthorized deviation, the rarity with which the unauthorized deviation provision was invoked, the disparate ways it was applied when it was invoked in Mr. Gordon's case, and United's inability to identify the management employee responsible for characterizing Mr. Gordon's conduct, that United's stated reason was a pretext for discrimination. "[W]hen the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a fact finder may reasonably infer that unlawful discrimination was the true motivation." Adreani, 154 F.3d at 395

(citations omitted). Summary judgment is therefore inappropriate. See id.

Conclusion

For the foregoing reasons, we reverse the judgment of the district court and remand for proceedings consistent with this opinion. REVERSED and REMANDED

Easterbrook, Circuit Judge, dissenting. This case illustrates how McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), has become so encrusted with the barnacles of multi-factor tests and inquiries that it misdirects attention. Could a reasonable trier of fact conclude that Gordon is the victim of age or race discrimination? If yes, then summary judgment must be denied; if no, then the grant of summary judgment for the employer must be affirmed. Instead of addressing this question straightforwardly, however, my colleagues follow a tortuous path to the conclusion that Gordon is entitled to a trial because United Airlines, the employer, does not have a written policy defining "unauthorized deviation," so that people may in good faith debate whether Gordon committed that infraction. I grant that United is not petrified with bureaucracy and does not cover every topic with reams of paper, as my colleagues believe that an employer must to prevail in an employment-discrimination case. United can only gaze toward the heights occupied by the Postal Service, the Social Security Administration, and the Immigration and Naturalization Service. But what has the state of its manuals and handbooks to do with race or age discrimination?

The majority's long discussion of legal criteria and prima facie cases diverts attention from the question whether a sensible trier of fact could infer that age, race, or some other forbidden characteristic, made a difference. The Supreme Court set out in McDonnell-Douglas to identify circumstances that would support an inference of discrimination, throwing a burden of explanation on the employer. Today's case shows how that program has failed. In every large firm it is possible for almost every employee to make out a prima facie case. United employs thousands of

flight attendants, of all ages, races, religions, sexes, and so on; some were retained while others were fired. Gordon met the airline's minimum standards, or he would not have been hired; he had received good reviews as a probationary flight attendant until the incident that precipitated his discharge; and from this it follows (he says) that all elements of McDonnell-Douglas have been satisfied and it is more likely than not that his discharge was caused by his age or race. Only a lawyer trapped in a warren of "tests" and "factors" could make such a connection. Everything true about Gordon is true about United's other employees; can all of them be victims of discrimination?

Appellate judges must apply McDonnell-Douglas while the Justices support it, and I therefore do not quarrel with my colleagues' conclusion that Gordon has established a prima facie case of discrimination. United provided an explanation for discharging him--that instead of appearing in Los Angeles for a flight to Seattle, Gordon flew to Chicago and told the crew desk that he had legally insufficient rest and therefore could not serve as a flight attendant that day. United understandably wants to discourage such conduct by its probationary employees, because weaseling out of flight assignments does not bode well for future performance. Unless this nondiscriminatory explanation is a fraud on the court--not just an overreaction, but a lie--United must prevail. See Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 2108-09 (2000); Wade v. Lerner New York, Inc., No. 00-1115 (7th Cir. Mar. 5, 2001), slip op. 6-7; Ritter v. Hill 'N Dale Farm, Inc., 231 F.3d 1039, 1044-45 (7th Cir. 2000); Kulumani v. Blue Cross Blue Shield Association, 224 F.3d 681 (7th Cir. 2000); Hartley v. Wisconsin Bell, Inc., 124 F.3d 887, 890 (7th Cir. 1997) (employer prevails if it "honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless").

What evidence could justify a reasonable trier of fact in concluding that United is trying to pull the wool over judicial eyes? In a word, none. My colleagues emphasize that United lacks formal policies defining "unauthorized deviation" and that its supervisors did not agree among themselves when asked what Gordon should have done. This is a fair appreciation of the record. But how does it support an inference that United (or any of its managers) is trying to bamboozle the court? "No company needs to have a set procedure for what action it will take when adjudicating every single employee problem." 6 West Limited Corp. v. NLRB, 237 F.3d 767, 778 (7th Cir. 2001). Uncertainty and disagreement

existed within the company, both about how employees were supposed to behave and about what supervisors should have done in response. There is additional doubt about what Gordon told the crew desk at O'Hare, as there is apt to be about every oral exchange. Gordon insists that he told United that he was unable to fly only at the moment of the conversation; United responds that this made the conversation pointless (why was Gordon at the crew desk except to get out of duty scheduled for later that day?); but no matter which inference is drawn, race and age play no role. What could anyone at United be trying to hide by taking one view of the conversation rather than another? Nothing in this record suggests that anyone is lying (let alone prevaricating to conceal reliance on Gordon's race or age). Disagreements about the characterization of ambiguous acts are part of the human condition, not proof of deceit or unlawful discrimination. A demonstration that United's practices bore more heavily on black or older workers might supply what is missing, see Bell v. EPA, 232 F.3d 546, 552-54 (7th Cir. 2000), but Gordon has not adduced statistical evidence.

Instead of meeting head on the question whether United's explanation might have been fabricated, the majority resorts to a quotation from Adreani v. First Colonial Bankshares Corp., 154 F.3d 389, 395 (7th Cir. 1998), which said that a plaintiff may demonstrate pretext with "evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge." This sounds like a conclusion that pretext may be demonstrated by showing that the employer's reason was mistaken, wrong, inadequate under the collective bargaining agreement, and so on. Yet Reeves and many other cases have emphasized that an error won't do; a truthful, nondiscriminatory explanation, right or wrong, ends the case. See also Anderson v. Baxter Healthcare Corp., 13 F.3d 1120 (7th Cir. 1994); Pollard v. Rea Magnet Wire Corp., 824 F.2d 557 (7th Cir. 1987). My colleagues recognize this--and then add that a trier of fact may equate mistake with deceit. How else could it be that an "insufficient" reason shows pretext? Allowing debate about the adequacy of the explanation to support an inference of pretext removes the need to prove discrimination from the law of employment discrimination and confuses federal restrictions on employers' deeds with a quest for "just cause" under collective bargaining agreements. To conclude that blunders and intra-corporate disarray support an inference of deceit is to countermand the instructions of Reeves.

Perhaps Adreani could be rehabilitated by reading its last clause to refer only to explanations "insufficient" in the sense that they do not identify the actual cause of the discharge. Pryor v. Seyfarth, Shaw, Fairweather & Geraldson, 212 F.3d 976 (7th Cir. 2000), illustrates an explanation "insufficient" in this sense. But Gordon does not deny that United's stated reason is its actual one; the events that ended in his absence from the Los Angeles to Seattle flight led straight to his discharge. Causation is undisputed; that United was actually (and legitimately) disappointed with Gordon's conduct also is undisputed; what Gordon argues is that these events should have led to a reproof rather than a discharge. To say that such an argument, fundamentally identical to one a labor arbitrator would resolve in response to a grievance, can be the core of a federal employment-discrimination claim is to confuse the lack of "just cause" with "discrimination."

I appreciate the potential response that the odder a reason seems in light of an employer's normal practices, the easier it is to understand the explanation as a lie. But here the explanation is not out of whack with the employer's norms; Gordon contends, rather, that norms were applied inaccurately. He compares his situation to that of other flight attendants who overslept or missed flights by other mischance; United responds that Gordon missed this flight by choice, not by mishap, and that the difference is vital to the success of its scheduling. My colleagues' emphasis on the fact that United did not have a written definition of "unauthorized deviation" and that different United supervisors appeared to have different understandings of that phrase simply demonstrates that the supervisors and managers could not have been lying. There was no "truth of the matter" at all. There may be material disputes about whether the supervisors were confused, or mistaken, or whether on balance Gordon should have been allowed another chance. But it is not possible to say that these considerations entail a material dispute about whether the major actors at United have committed perjury.

The majority's opinion exemplifies the spirit of cases such as Wright v. Illinois Department of Corrections, 204 F.3d 727, 730 (7th Cir. 2000), and Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999), which proclaim: "Because issues of intent and credibility are especially crucial in employment discrimination cases, we must apply this summary judgment standard with added vigor." (This language is from Wright; similar assertions elsewhere are not hard to

find, though often, as in Pitasi, "added vigor" changes to "added rigor". See Webb v. Clyde L. Choate Mental Health & Development Center, 230 F.3d 991, 997 (7th Cir. 2000).) The majority opinion is "added vigor" in action, even though Wright does not receive a citation, and the "added rigor" passage from Pitasi (an opinion cited seven times) is not quoted. Yet I doubt that appellate judges should be "adding" any hurdles to either side in employment-discrimination cases, beyond those prescribed by Fed. R. Civ. P. 56. Summary judgment is a hurdle high enough without "added vigor."

What does "added vigor" mean? One possibility could be that we review the district court's decision especially carefully in employment-discrimination cases. Yet appellate review of all orders granting summary judgment is de novo. To say that we apply extra rigor in employment-discrimination cases is to imply that we are not doing our jobs in other cases--that we are deferential in those cases but non-deferential here. This is not an accurate statement of circuit practice.

Another possible meaning is that in employment-discrimination cases, and other subjects in which the pivotal question is the intent with which one of the parties acted, district courts must disfavor summary judgment. Poller v. CBS, Inc., 368 U.S. 464, 473 (1962), announced such an approach for antitrust, and appellate courts extended it to other situations in which motive mattered. That captures the spirit of the majority's opinion. The problems with Poller, and the "added vigor" approach in general, are two. First, it has no purchase in the language of Rule 56 or the standard announced in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), for implementing that rule. The summary-judgment standard is supposed to track the standard for sufficiency of evidence at trial. If a sensible jury could find in favor of the party opposing the motion, then summary judgment must be denied. That is a universally applicable standard; there is no room for a thumb on the scale against summary judgment in any class of cases. See Edward J. Brunet, Martin H. Redish & Michael A. Reiter, Summary Judgment: Federal Law and Practice sec.9.13 (2d ed. 2000). Second, Poller itself has been conformed to the Rule 56 standard. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), holds that no special standard is appropriate when state of mind is at issue. See also Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 595 (1986).

Our "added vigor" cases do not cite Liberty Lobby or Matsushita, and it may be that our

panels were unaware of the history behind this approach, the fate of Poller in the summary judgment trilogy of 1986, and the fact that earlier panels had held (relying explicitly on the decisions of 1986) that motions for summary judgment in employment cases need not surmount any extra hurdle. See, e.g., Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1396 (7th Cir. 1997). It is not an adequate response to say (slip op. 27 n.15) that the "circuit has confirmed--explicitly--that there is but one standard by which we measure a grant of summary judgment." Wohl v. Spectrum Manufacturing, Inc., 94 F.3d 353, 355 n.1 (7th Cir. 1996), the case cited for this proposition, predates the flurry of references to "added vigor" and "added rigor" during the last three years. Wohl says that there is one summary judgment standard, applied rigorously in all cases. What, then, are we to make of the multiple post-Wohl assertions that in employment-discrimination cases the court applies added rigor (or vigor)? These decisions say that the standard in employment cases is higher; that is what the word "added" means. Our "added rigor" cases are incompatible with Wohl, Wallace (a decision my colleagues do not cite), and the jurisprudence of the Supreme Court. We should clear up this conflict rather than continue to practice an approach disfavoring summary judgment in employment-discrimination suits.

/1 Another PFA--a white female under 40--was also assigned to stay at the Days Inn on August 5, 1997, and she avers that she spent that night on the first floor of the Days Inn.

/2 According to both parties, a "legal rest" means the amount of time necessary before a flight attendant is eligible to begin another duty period. The minimum length is between 8-11 hours, and Mr. Gordon states that his length was 10 hours.

/3 Originally, Mr. Gordon also alleged that United had discriminated against him because of his sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000e et seq. The district court explained, however, that Mr. Gordon had waived his sex discrimination claim because he had failed to present it to the Equal Employment Opportunity Commission ("EEOC"). According to the court, in failing to present his claim to the EEOC, he failed to exhaust his administrative remedies and, thus, waived his sex discrimination claim. Mr. Gordon does not raise this issue in his brief; therefore, he has waived this argument on appeal. See Winter v. Minnesota Mut. Life Ins. Co., 199 F.3d 399, 411 n.17 (7th Cir. 1999).

/4 The parties agree that Mr. Gordon is attempting to prove discrimination by indirect evidence.

/5 The court also noted that two other managers at United, James Younglove and Glen Scoggins, had agreed with Siemieniec's decision to release Mr. Gordon.

/6 See Stewart v. Henderson, 207 F.3d 374, 376 (7th Cir. 2000) (race); Pitasi v. Gartner Group, Inc., 184 F.3d 709, 716 (7th Cir. 1999) (age); Hughes v. Brown, 20 F.3d 745, 746 (7th Cir. 1994) (race); Young v. Will County Dept. of Pub. Aid, 882 F.2d 290, 293 (7th Cir. 1989) (age).

Although some, including our colleague in dissent, are anxious to sound the death knell for the McDonnell Douglas construct, such an action clearly is, at best, premature. As recently as last term, the Supreme Court in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000), employed the McDonnell Douglas analysis to assess a claim under the ADEA. See Reeves, 530 U.S. at 142 ("This Court has not squarely addressed whether the McDonnell Douglas framework, developed to assess claims brought under sec. 703(a)(1) of Title VII of the Civil Rights Act of 1964, . . . also applies to ADEA actions. Because the parties do not dispute the issue, we shall assume arguendo that the McDonnell Douglas framework is fully applicable here.") (internal citations omitted).

Furthermore, as an intermediate appellate court, we certainly have no authority to abandon governing case law from the Supreme Court. Cf. DeWalt v. Carter, 224 F.3d 607, 617 (7th Cir. 2000) (noting that the Supreme Court looks askance at appellate courts' actions in prematurely anticipating the overruling of prior case law). Indeed, we recently have been reminded that "it is [the Supreme] Court's prerogative alone to overrule one of its precedents." State Oil Co. v. Khan, 522 U.S. 3, 20 (1997). Finally, we note that Congress has attempted to harmonize more recent enactments with the McDonnell Douglas burden-shifting analysis. See H.R. Rep. No. 102-40 (II) (Judiciary Committee), at 7, 1991 U.S.C.C.A.N. 699-700 ("The Committee notes that placing the burden of proof on employers to establish business necessity in disparate impact cases, is not inconsistent with the allocation of burden of proof in disparate treatment cases as set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973), and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981)."). Giving due deference to the pronouncements of a higher judicial bench and of the reliance by the legislature on those

pronouncements, we cannot, with the ease of our dissenting colleague, cast aside McDonnell Douglas. Given these considerations--the deference we owe to the Supreme Court of the United States and the respect we owe the policy decisions of the Congress--this case is neither the time nor the place to engage in an extended discussion of the utility of the McDonnell Douglas methodology. Our task is to decide this case under its well-established principles.

/7 See McDonnell Douglas, 411 U.S. at 802; Stewart, 207 F.3d at 376; Pitasi, 184 F.3d at 716.

/8 See also McDonnell Douglas, 411 U.S. at 802-03; Stewart, 207 F.3d at 376.

/9 See Denisi v. Dominick's Finer Foods, Inc., 99 F.3d 860, 864 (7th Cir. 1996) ("Here, as in many employment discrimination cases, the second element of the prima facie case, satisfactory job performance, and the issue of pretext focus on the same circumstances because the employer maintains that the discharge was based on its reasonable belief that the employee was not performing in an acceptable manner."); see also Fortier v. Ameritech Mobile Communications, Inc., 161 F.3d 1106, 1113 (7th Cir. 1998) (stating that, "[a]s is also often the case, there is a great deal of overlap with respect to the factual inquiry relevant" to the legitimate performance expectations prong of the prima facie case and the pretext argument).

/10 Five other PFAs missed a flight but received warnings only. The reasons these employees missed their flights were as follows: (1) one employee did not call into United's Crew Desk, (2) another employee's pager did not beep (there was also an allegation that another time she fraudulently called in sick when her problem really related to her ability to commute), (3) a third employee left her pager at home, (4) a fourth employee was prevented from commuting from her home city to her departure city due to the weather, and (5) the final employee overslept, which caused him to check in late.

/11 The guidelines provided to PFAs at their training establish the rules for their discipline and outline several categories under which a PFA could be disciplined for substandard performance. The applicable category here is titled "Violation of Company rules and [p]olicies." R.23, Ex.9 at 6. Under that heading, the PFA guidelines read: "Violation of the Articles of Conduct will, in most instances, result in immediate separation." Id. One of the violations of the Articles of Conduct is "Unauthorized deviation from a scheduled trip assignment." R.23, Ex.15 at 3.

The Articles of Conduct further warn that an unauthorized deviation by an employee is one of the violations of company policy that "will result in disciplinary action up to and including discharge." Id. It then notes that, for violations such as an unauthorized deviation, "[d]iscipline will normally commence with a suspension unless the particular situation or the employee's record warrants more severe action." Id.

/12 Velasco originally wrote "DNF" on Mr. Gordon's schedule. At his deposition he explained that a "DNF is a term that we use for different things. It is not a violation. It just says that the flight attendant did not fly. Now the flight attendant needs to provide to his immediate supervisor what is the occurrence of that DNF and what happened in his situation. All we do is provide the information to the immediate [supervisor]." R.23, Velasco dep. I, at 92. Several days after Mr. Gordon's missed flight, Siemieniec asked for a report on the incident and only at that point did Velasco characterize Mr. Gordon's conduct as a deviation "without authorization." R.21, Ex.32.

/13 According to Younglove, Siemieniec did not ask him whether Mr. Gordon's conduct constituted an unauthorized deviation; instead, Siemieniec came to him and stated: "'I think I have an individual that has deviated from his assignment that's at the crew desk at this time.'" R.21, Ex.15 at 15.

/14 Moreover, Glen Scoggins defined an unauthorized deviation as when "the flight attendant was not available to take their scheduled assignment because they had made themselves unavailable either by taking another trip or some other means. And they did that without approval from Crew Scheduling." R.21, Ex.19 at 17-18.

/15 We are also constrained to note that the dissenting opinion's suggestion that we are applying a higher summary judgment standard than the one mandated by the precedent of the Supreme Court and this court finds no support in the text of this opinion. This circuit has confirmed--explicitly--that there is but one standard by which we measure a grant of summary judgment. See Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 355 n.1 (7th Cir. 1996). To suggest that we have applied another standard without disclosing it is totally unwarranted.