**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued February 28, 2006
Decided May 31, 2006

**Before**

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

No. 05-1281

| | |
|---|---|
| PAMELA LEWIS,<br>　　　*Plaintiff-Appellant,*<br><br>　　v.<br><br>ZIKER CLEANERS, INC.,<br>　　　*Defendant-Appellee.* | Appeal from the United States District Court for the Northern District of Indiana, South Bend Division<br><br>No. 03 CV 538<br><br>Allen Sharp,<br>*Judge.* |

**O R D E R**

Pamela Lewis filed a *pro se* complaint (she retained counsel in the district court) against her employer, Ziker Cleaners, alleging race discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623. The district court, adopting the magistrate judge's Report and Recommendation, granted Ziker's motion for summary judgment. Lewis appeals and we affirm.

Lewis worked for 22 years in Ziker's dry cleaning production department as a press operator and was 49 when the company discharged her in July 2002. Ziker provides dry cleaning, dust control, and uniform rentals. In order to measure its employees' productivity, Ziker recorded the number of items the employee pressed in one day, the time spent in pressing the items, and the difficulty in completing

each task.  If an employee lacked garments to press for a period of time, the employee was required to record that fact on a Daily Production Record form in that the total time worked could be reduced and thus the idle time would not negatively affect the employee's production rate.  Article XXIII(b) of the collective bargaining agreement ("CBA")—which regulated Lewis's employment—required that an employee "receive a written warning and a three day suspension prior to discharge" for "failure to maintain department production standards," though it did not specify Ziker's method for calculating those standards.

Ziker hired Lewis in 1980 and her troubles commenced several years later in 1993.  She received two written and two verbal warnings between 1993 and 1996, for "continuous substandard production (under 100%)."  In September 1999, she received a letter from the retail production manager John Mertes memorializing a meeting held between Lewis, Mertes, and Union Steward Earline Boatman.  The letter stated that Lewis's production rate was below 50% and 30% less than the average of her co-workers.  Mertes offered to allow Lewis to move to the pants pressing line which might allow her to achieve a higher level of production, but warned that a future production rate of less than 75% would result in "further disciplinary action which may include discharge."  She received two addition letters in 1999 warning that her production rate was sub-standard.

Lewis's next warnings came in 2001.  At the time she worked on the "hot head" presses, which, as a production group, Ziker found to be low-performing.  The April 2001 letter Lewis received from Mertes documented a verbal warning she received for "unsatisfactory work performance" during the week of April 21, 2001; her production rate was 56%.  Mertes also stated that Ziker expected her to perform at her group's average production rate of 64%, which was a lower expectation than both the 75% production rate communicated to her in September 1999 and the company's goal of achieving a 100% production rate.  She received a second letter in May 2001, again warning her that her performance was deficient because it had not reached 64%, although the letter noted that her production rate had increased to 60%. The same month Mertes completed a "performance evaluation worksheet," which Lewis reviewed and signed, judging Lewis's work performance "below acceptable standards."  She received two additional written warnings in July 2001 and February 2002, informing her that her production rate remained below the 64% expected of her.  Her rate for the two months had dropped to 57% and 56%, respectively.  Finally Mertes suspended Lewis for three days without pay, from May 1-3, 2002.  Lewis returned to work, but Ziker terminated her employment on July 24, 2002 because her production rate remained below 64%; her rate for the week ending July 19 was 59%.

In the district court, Lewis chose to proceed under the indirect method of proving racial or age discrimination described by the Supreme Court in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Accordingly, she was required to first show *prima facie* evidence of discrimination by demonstrating that she: (1) is a member of a protected class, (2) was meeting Ziker's legitimate performance expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than similarly situated individuals who are not members of her protected class. *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005). Age discrimination exists when a plaintiff is more than 40 years old and is treated differently than younger employees. *See Griffin v. Potter*, 356 F.3d 824, 828 (7th Cir. 2004).

Ziker moved for summary judgment. The company did not dispute Lewis's ability to meet the first and third prongs of the *prima facie* case. Regarding the second prong, Ziker argued that Lewis was not meeting its legitimate job expectations. Ziker relied primarily on Mertes's affidavit, in which he stated that Lewis was terminated because she did not meet the "cut-off percentage" of 64% (the average production rate for her group). Regarding the fourth prong, Ziker suggested that Lewis could not identify a similarly situated individual who was treated more favorably.

In opposition to Ziker's motion Lewis primarily argued that the 64% minimum production rate applied only to her. She suggested that Ziker did not require other employees to meet the same production rate and that no other employee had been terminated for falling short of his quota. She also disputed the Daily Production Report submitted by Ziker for July 22, 2002, arguing that it did not accurately represent the work she completed that day. Finally, she asserted that a Ziker employee responsible for distributing garments to the pressers did not give her a sufficient number of garments. She reasoned that these facts refuted Ziker's claims that she was not meeting its legitimate job expectations. Lewis also identified one employee below the age of 40 as a comparator (for purposes of *McDonnell Douglas* burden-shifting analysis) because that employee was warned about her production rate, like Lewis, but was not terminated. According to Lewis, Ziker's treatment of this employee demonstrated that a similarly situated employee outside her protected class was treated more favorably than she.

A magistrate judge rejected Lewis's arguments in a Report and Recommendation. The magistrate began by finding that Lewis was not meeting Ziker's legitimate expectations. He first concluded that Lewis failed to meet expectations because her production rate did not satisfy "the company goal, performing at 64%." Though the magistrate judge did not explore the calculations underlying the 64% minimum performance rate, he found that Ziker "had a clear mathematical standard for determining productivity that was established by an independent engineer." He further explained that "[t]he only reason that the 64% standard was applied to [Lewis] was because she continually failed to meet the

required 100% standard . . . . [Ziker] would notify employees such as [Lewis], when their work fell below the expectation level." Next, the magistrate judge discounted the alleged inaccuracy of the July 22 production sheet because Lewis was terminated as a result of her poor performance for the week ending July 19; the July 22 production report was not a basis for her termination. Finally, the magistrate judge determined that Lewis could not demonstrate that a similarly situated employee from outside the protected class was treated more favorably because—according to Mertes's deposition testimony on which she herself relied—her proposed comparator's performance improved after a *single* warning. Lewis, by contrast, progressed through all three steps of the disciplinary procedure outlined in the CBA, resulting in the termination of her job. The district court accepted the Report and Recommendation of the magistrate judge over Lewis's objections.

We review the grant of summary judgment de novo, construing the facts supported by relevant evidence in the light most favorable to the non-moving party. *See Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 432 (7th Cir. 2005). Here, Lewis argues that the district court erred on three counts, but underlying all three is the assertion that the elements of the *prima facie* test should be altered because, according to her, Ziker created an unpublished production standard that applied only to her. She initially alleges that she could not have failed to meet expectations because Ziker never published any production standards. Next, she asserts that the court erred when finding that she failed to establish that similarly situated employees outside her protected class were treated more favorably—the fourth prong of the *prima facie* case—because, according to her, other employees were not subject to the same 64% minimum production rate as she. Finally, she contends that the court should not have required her to demonstrate that she was meeting Ziker's expectations by increasing her production rate to 64%—the second prong of the *prima facie* case—because only she was disciplined for not meeting the rate.

Lewis's argument rests primarily on our decision in *Gordon v. United Airlines, Inc.*, 246 F.3d 878 (7th Cir. 2001). United Airlines terminated Gordon, a probationary flight attendant, when he "deviated without authority from his flight schedule." *Id* at 880. Gordon alleged that he was terminated on account of his race and age because other employees outside his protected class did not receive the same sanction for deviating from their flight schedules. *Id*. at 888. In that case, we found that Gordon could demonstrate a *prima facie* case of discrimination because United had not articulated "clearly established norms" against which to judge Gordon's performance and because other employees who had committed the same offense as Gordon were not similarly disciplined. *Id*. at 887. Thus, it could not be said (at least at the summary judgment stage of the proceedings) that Gordon failed to meet United's expectations or that other employee's outside the protected class had not been treated more favorably.

Lewis urges us to employ *Gordon*'s approach to the *McDonnell Douglas prima facia* case and find that she satisfied her burden. But, even applying *Gordon*'s interpretation of the second and fourth prongs, her case fails. The fundamental flaw in her argument is that she has not identified anyone who was similarly situated. Lewis contends that one employee below the age of 40 was warned that her production rate was unacceptable but not terminated and, in the alternative, that a comparator is unnecessary because she is arguing that *no* employee was subjected to the same 64% minimum production rate requirement. But, as *Gordon* explains, a similarly situated employee would be an individual who had the same consistently poor production rate as Lewis but was not fired. *See Gordon*, 246 F.3d at 888. Mertes's deposition testimony demonstrates that the performance rate of the employee Lewis identified improved after a single warning, making that employee an unsuitable comparator. Lewis has failed to name or identify a consistently under-performing employee who retained her job, and thus has failed to meet her burden on the fourth prong of the *prima facie* case.

Lewis next argues that she should not have been required to demonstrate that she was meeting Ziker's 64% minimum production rate. Though the second prong of the *prima facie* case may be inappropriate under certain fact patterns, *see, e.g., Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999) (plaintiff need not show she met employer's legitimate expectations if non-Hispanic co-workers who similarly failed to meet expectations were not discharged), it is nevertheless true that a plaintiff must identify a similarly situated employee outside the protected class who was also under-performing. *See Gordon*, 246 F.3d at 888, 890; *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("[w]hen a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner . . . the second and fourth prongs of *McDonnell Douglas* merge"). Lewis blindly asserts that the 64% minimum production rate applied only to her, but she has not pointed to any evidence supporting her assertion, such as an employee with a lower production rate who was not discharged. It is therefore irrelevant whether she could have proceeded under *Gordon* without producing evidence of meeting Ziker's expectations; the record does not show that any other employee also failed to meet those expectations.

In closing we note that Ziker's lack of a published standard against which to judge Lewis's performance is not, as she argues, proof that the unwritten standard applied only to her. We have not required companies to establish written rules that predict their response to problematic employees. *See, e.g., 6 West Ltd. Corp. v. NLRB*, 237 F.3d 767, 778 (7th Cir. 2001) ("No company needs to have a set procedure for what action it will take when adjudicating every single employee problem."). Ziker adhered to the terms of the CBA when it discharged Lewis; she

received eleven notices regarding her performance beginning in 1993, she was suspended for a three-day period, and because her performance did not improve she was discharged.  Though the 64% minimum production rate was not published, it represented the average production rate of Lewis's group and was intended to be a realistic goal for her to achieve. Ziker consistently notified Lewis when she was not meeting its expectations—both the goal of a 100% production rate and the minimum expectation of a 64% production rate.  Regardless of whether the rule was published Lewis was still required to show that at least one other employee fell short of the standard but was not disciplined in order to show a *prime facie* case of discrimination.  *See Gordon*, 246 F.3d at 888.  She could not.

AFFIRMED.